■ Myron G. Butler et al., Appellants, v New York State Olympic Regional Development Authority, Respondent. [738 NYS2d 774] —Spain, J. Appeal from a judgment of the Court of Claims (Collins, J.), entered June 13, 2001, upon a dismissal of the claim at the close of evidence.

Claimant Myron G. Butler (hereinafter claimant) and his wife, derivatively, commenced this action for personal injuries sustained by claimant in the aftermath of a skiing accident which occurred on March 8, 1998 at Gore Mountain Ski Center which is owned and operated by defendant. Claimant does not seek to recover for injuries sustained in his actual fall while skiing, namely, a dislocated shoulder, but, rather, claims that his further injuries were caused or exacerbated by the negligence of defendant's employees in rendering first aid and delaying required medical care by failing to arrange for his emergency medical transportation to a site of definitive medical care.

After being treated at the scene and transported to the base first aid station, claimant was taken by private vehicle to the

closest hospital, Glens Falls Hospital, located some 34 miles from Gore Mountain, where an emergency room physician immediately reduced his dislocated shoulder. The procedure quickly produced a return of his brachial (elbow) and radial (hand/wrist) pulse indicating resumed vascular function, i.e., blood circulation, to his left arm. The prolonged loss of blood supply, however, to all of the nerves in his left arm had extensively and permanently damaged the nerve fibers. The medical testimony at trial established that, inter alia, the dislocated shoulder had compressed the neurovascular structures of all five nerves of the brachial plexus (the main nerve into the shoulder and arm) and that the loss of blood supply caused severe and partially irreversible damage and loss of function to all of the nerves in his left arm.

Among the disputed issues raised by the trial testimony were the reasonableness of the amount of time defendant's ski patrollers took to care for and transport claimant off the mountain to the base first aid station, the failure of defendant's employees to summon an ambulance or Medivac helicopter and the medical cause or causes of the neurovascular compromise to claimant's left arm and hand. Of critical importance was whether the negligence—if any—of defendant's employees was a substantial factor in claimant's resulting injuries, i.e., whether a more speedy transport of claimant to the hospital would have prevented or minimized the nature or extent of his injuries. As such, considerable testimony was adduced focusing on defendant's share of the responsibility for the delay between the 12:15 P.M. skiing accident and claimant's 2:07 P.M. emergency treatment at the hospital, and the medical testimony establishing that irreversible nerve damage generally occurs after approximately one hour of neurovascular compromise to an arm, although it is progressive with time.

Following a nonjury trial, the Court of Claims issued a lengthy written decision granting defendant's motion to dismiss the claim which was made at the close of claimants' proof and renewed at the close of the trial. The court expressly found that claimants had failed to establish a prima facie case of defendant's negligence. Among other conclusions, the court determined that while claimants made a sufficient showing that defendant's employees had been negligent in failing to summon an ambulance to transport claimant to the hospital, claimants' proof did not demonstrate that this delay was the proximate cause of claimant's injuries, i.e., that the additional time attributable to transport in a private vehicle—calculated by the court to be approximately 27 to 32 minutes—was a

substantial causative factor in the nature or extent of claimant's injuries. On claimants' appeal, we reverse the dismissal of their claim, finding that they submitted sufficient evidence which, if credited, established a prima facie case that defendant's employees were negligent and that this negligence was the proximate cause of claimant's injuries.

We begin with the well-recognized proposition that on a motion to dismiss a claim at the close of proof pursuant to CPLR 4401 based upon claimants' failure to make out a prima facie case, *the evidence must be viewed in the light most favorable to claimants*, the nonmovants, and the court must afford claimants every favorable inference which may properly be drawn from the evidence (*see, Szczerbiak v Pilat*, 90 NY2d 553, 556; *Schriber v Melroe Co.*, 273 AD2d 650, 652; *Lyons v McCauley*, 252 AD2d 516, *lv denied* 92 NY2d 814). Only if, upon so viewing the evidence presented, there is no rational process by which the factfinder could base a finding in favor of claimants, is judgment dismissing their claim as a matter of law appropriate (*see, Szczerbiak v Pilat, supra*). Thus, in this procedural context, both parties err by arguing that this Court should defer to or override the fact finder's credibility assessments of the trial witnesses and weighing of the conflicting evidence (*see, Fenton v Ives*, 229 AD2d 704, 705; *see also*, Siegel, NY Prac § 402, at 649 [3d ed]; *cf.*, CPLR 4404 [b]). The Court of Claims did not render a verdict in defendant's favor acting as a factfinder but, rather, dismissed the claim based upon its legal conclusion that even under the best circumstances, claimants had failed to make out a prima facie case upon which it could find that defendant's negligence proximately caused any aspect of his injuries (*cf., Ether v State of New York*, 235 AD2d 685).

So viewed, the evidence presented at trial established that at approximately 12:15 P.M., claimant was involved in a skiing accident during which he became airborne and landed on his head and left shoulder. William Boswell, employed by defendant as a ski patroller, arrived at the scene at approximately 12:20 P.M. and assessed claimant's condition, discerning a possible left shoulder dislocation or fracture with neurovascular compromise. Boswell radioed for delivery of a wire splint and rescue sled to transport claimant to the base first aid station located about 100 to 150 yards below. The supplies arrived within about four minutes (approximately 12:24 P.M.) and Boswell and another ski patroller applied the splint to claimant's shoulder and arm, padding and securing the splint in place. Claimant was transported on a chair board in the sled to the base first aid station, arriving outside the station between ap-

proximately 12:50 P.M. and 12:55 P.M.; he was transferred to a gurney and taken inside the station just before 1:00 P.M., where a registered nurse employed by defendant examined claimant and confirmed a probable shoulder dislocation. The nurse was unable to detect a radial or ulnar pulse in claimant's left wrist but reported he had good capillary refill, indicating some circulation to the fingers, but claimant had severe pain with no feeling in his left arm and hand. Defendant's employees did not call an ambulance and, although there was disagreement as to how the decision was reached, claimant was ultimately transported by a friend in his private vehicle to the nearest hospital located 34 miles away, where he arrived at approximately 2:07 P.M.

Claimant's ski safety expert, Richard Penniman, testified that Boswell—having discerned that claimant had sustained a possible dislocated shoulder with attendant neurovascular compromise—failed to follow the standard of care established by the National Ski Patrol System, its Outdoor Emergency Care Manual and general industry standard by failing to immediately call to arrange for an ambulance to be waiting at the base first aid station to transport claimant to the nearest definitive care facility as rapidly as possible. Indeed, Boswell essentially conceded this point in his testimony. Penniman further opined that the care and transport of claimant to the base first aid station located 100 to 150 yards down the mountain should not have taken 36 minutes under the circumstances, that this deviated from the controlling standard of care, and that the ski patroller's care and transport of claimant "should not have taken more than 10 to 15 minutes." Notably, the Court of Claims overruled defendant's objections to Penniman's competency to render an opinion regarding the appropriate amount of time that it should have taken defendant's ski patrollers to transport claimant from the ski accident site to the base first aid station, and defendant does not argue on appeal that this ruling was in error.

Hence, if credited, the testimony viewed most favorably to claimants established that Boswell, after arriving at 12:20 P.M., assessing claimant's condition and receiving by 12:24 P.M. the equipment he requested, should have cared for claimant, splinted his arm and shoulder, stabilized him and transported him to the base first aid station sometime between 12:34 P.M. and 12:39 P.M.* While the Court of Claims stated in its decision that it was "not persuaded * * * that Boswell unduly

---

* We note that Penniman never testified that the four minutes it took for the requested rescue equipment to arrive was unacceptable and did not

delayed in performing his necessary tasks upon the injured claimant on the mountain and transporting him by toboggan to the base first aid station," and defendant provides in its brief various reasons to discredit Penniman's testimony, these arguments are misplaced on a motion to dismiss a claim for failure to make out a prima facie case. In this regard, claimants were entitled to every favorable inference which may properly be drawn from the facts presented (*see, Szczerbiak v Pilat*, 90 NY2d 553, 556, *supra*), including the conclusion offered by their ski safety expert that, under the circumstances of this case, defendant's ski patrollers were negligent in unduly delaying his care and transport longer than 10 to 15 minutes.

Turning to the testimony addressing the amount of time that it might have taken to transport claimant to the hospital via ambulance, claimants offered testimony that the average response time (from dispatch to arrival at the station) for the volunteers of the local rescue squad is 10 to 15 minutes, and that the drive from the station in the ambulance to Gore Mountain, a distance of about three miles, takes approximately 3 to 4 minutes. Further, claimants submitted testimony that a routine ambulance trip from the Gore Mountain base first aid station to Glens Falls Hospital would take between 35 and 40 minutes. Thus, assuming Boswell had immediately taken steps to summon an ambulance from the accident site, at or soon after 12:20 P.M., the ambulance could have arrived at the base first aid station between 12:33 P.M. and 12:39 P.M. (i.e., the 10 to 15 minutes is added to 3 to 4 minutes, for a total ambulance response time after the emergency call of 13 to 19 minutes). If Boswell had transported claimant to the base first aid station within 10 to 15 minutes as Penniman opined he should have, under the best circumstances claimant could have arrived at the base station between approximately 12:30 P.M. and 12:35 P.M., very near the estimated arrival time of the ambulance and been immediately transported to the hospital. The average 35 to 40 minute travel time for the ambulance to get to the hospital would have meant that claimant could have arrived and received emergency treatment between approximately 1:08 P.M. and 1:13 P.M.—nearly an hour before his actual 2:07 P.M. arrival.

We cannot agree, however, with claimants' contention that the Court of Claims erred in ruling that on the proof presented, defendant could not be found to have been negligent based on

include this waiting time for equipment in his 10 to 15-minute estimate and, thus, the 10 to 15-minute period is deemed to begin to run no sooner than 12:24 P.M.

its employees' failure to summon a Medivac helicopter from Albany Medical Center. While claimants offered testimony that the one-way trip for a Medivac helicopter from Gore Mountain to Albany Medical Center is 18 minutes, no evidence was adduced regarding the criteria for dispatch and whether they would have been dispatched under these circumstances.

Thus, the issue distills to whether claimants submitted sufficient evidence which, if credited, would demonstrate that the negligence of defendant's employees in precipitating an approximately one-hour delay in securing the necessary emergency medical care and transportation was a substantial cause of claimant's ultimate injuries, i.e., that claimant's injuries were proximately caused by defendant's negligence (see, Derdiarian v Felix Contr. Co., 51 NY2d 308, 315; Murray v New York City Hous. Auth., 269 AD2d 288). The extensive medical proof adduced at trial established that claimant's dislocated left shoulder caused an interruption of normal blood flow to his left arm and hand; this cessation of vascular function severely deprived the nerve fibers of all five nerve roots which emanate from the brachial plexus of essential nutrients (such as oxygen and glucose) which severely and, in large part, irreversibly damaged the nerves. When claimant's shoulder dislocation was reduced shortly after his 2:07 P.M. arrival at the emergency room, the vascular function (i.e., the blood supply and pulse) immediately returned, but he had already sustained profound nerve damage in his left arm and hand.

As explained, there was a general consensus among the medical experts at trial that the critical time period is approximately *one hour* from the interruption of the blood flow in which the blood supply must be restored to the brachial plexus nerves to prevent the start of irreversible nerve death. The experts also concurred that there is no exact cutoff time, in that the longer the blood supply is interrupted, the greater the extent of irreversible nerve damage, as the injury is progressive. Christopher Calder, claimant's expert and a Board-certified neurologist who treated claimant, testified that the critical time period in which the blood flow needed to be restored to his arm was about one hour, maybe 1½ hours, and that, by the end of the hour, "there will be nerve damage" and "the nerve fibers start dying." Calder further opined that if the blood supply is restored within the one-hour period, "[t]here is usually recovery of the nerves."

Viewing the medical and other testimony in the light most favorable to claimants, we find that they made out a prima facie case that defendant's negligence in delaying the removal

of claimant from the scene of the accident and failing to secure emergency medical transportation proximately caused claimant's injuries. That is, claimants submitted adequate evidence which, if credited by a factfinder, demonstrated that under the best circumstances, inter alia, if Boswell had summoned an ambulance from the site of claimant's fall and transported claimant to the base first aid station in 10 to 15 minutes, claimant could have arrived at the emergency room via ambulance between 1:08 P.M. and 1:13 P.M., which was within the medically-determined, critical one-hour period—following the 12:15 P.M. skiing accident—in which to restore blood circulation and avoid irreversible nerve damage or nerve death. The testimony so viewed was sufficient to establish that defendant's negligence in causing an approximately one-hour delay in securing emergency medical care was a competent producing cause of claimant's injuries. Thus, the Court of Claims erred in granting defendant's motion to dismiss the claim based upon claimants' failure to make a prima facie showing of negligence against defendant. The case should now be remitted for the court to review the record and determine the matter.

Peters, J.P., Mugglin, Rose and Lahtinen, JJ., concur. Ordered that the judgment is reversed, on the law, without costs, and matter remitted to the Court of Claims for further proceedings not inconsistent with this Court's decision.