■ TEL OIL COMPANY, INC., et al., Plaintiffs, v CITY OF SCHENECTADY et al., Defendants. (Action No. 1.) JEAN A. FRANK, as Administrator of the Estate of THOMAS B. FRANK, Also Known as THOMAS S. FRANK, Deceased, and on Behalf of KATHERINE R. FRANK et al., Appellant, v CITY OF SCHENECTADY et al.,

---

Respondents. (Action No. 2.) CHRISTINE TISCIONE, Appellant, v CITY OF SCHENECTADY et al., Respondents. (Action No. 3.) (And a Third-Party Action.) (And Two Other Related Actions.) [757 NYS2d 121] —Peters, J. Appeal from an order and judgment of the Supreme Court (Kramer, J.), entered December 5, 2001 in Schenectady County, upon a verdict rendered in favor of defendants.

Having previously reviewed the denial of certain defendants' motions for summary judgment (278 AD2d 571 [2000]), we assume familiarity with the facts of this case and recount only those relevant to the instant appeal. Tel Oil Company, Inc. operates a gas station in the City of Schenectady, Schenectady County, in front of a steep hillside owned by defendants City of Schenectady and Schenectady Urban Renewal Agency (hereinafter collectively referred to as defendants). Running above the bottom of the hillside is Old Veeder Road, situated on top of a steel crib wall located directly behind the gas station. After the use of this road in 1994 by defendants Bennett Contracting, Inc. and R.A. Lynch Trucking in connection with work for defendant Schenectady Municipal Housing Authority (hereinafter MHA), Peter Jacobs, president of Tel Oil, noticed deposits of mud and debris on both the crib wall and the gas station property. Believing such deposits were caused by an erosion of the crib wall due to the actions of Bennett and Lynch, Jacobs wrote a letter to then Schenectady Mayor Frank Duci on July 11, 1994 urging an immediate inspection of the property in an effort to "safeguard over 500 feet of land hanging over the head of [his] business." In response, Duci drafted a memo to Sharon Jordan, executive director of MHA, and Milton Mitchell, the City's commissioner of engineering and public works, to inspect such property to avoid a "tragic accident, and/or law suite [sic]." Various officials thereafter inspected the property which resulted in the placement of hay bales and sandbags in front of the crib wall.

In April 1995, Jacobs wrote a second letter to Duci. This time, he asserted that the crib wall was being undermined and threatening to collapse. These actions prompted a second inspection by the City and MHA representatives which resulted in no further action. On January 19, 1996, the hillside, located well behind the crib wall, collapsed, causing an enormous landslide of mud and debris onto the gas station which killed Thomas B. Frank (hereinafter decedent), a patron thereat, and caused nonfatal injuries to plaintiff Christine Tiscione.

Plaintiff Jean A. Frank commenced a negligence action seeking damages for, inter alia, the wrongful death and pain and

suffering of decedent (Action No. 2) and Tiscione commenced a separate action seeking damages for her physical and psychological injuries (Action No. 3). In September 2001, a trial was held where defendants propounded the theory that the collapse of the hillside was solely and exclusively caused by an act of God. At the close of proof and prior to the verdict being rendered, Frank and Tiscione (hereinafter collectively referred to as plaintiffs) moved for a directed verdict pursuant to CPLR 4401. When the jury rendered a verdict in favor of defendants upon the proffered defense, plaintiffs moved for judgment notwithstanding the verdict pursuant to CPLR 4404 (a). Supreme Court ultimately denied all motions, entered the judgment dismissing the actions and plaintiffs now appeal.

In reviewing a motion for a directed verdict (*see* CPLR 4401), "the evidence must be viewed in the light most favorable to * * * the nonmovants, and the court must afford [such parties] every favorable inference which may properly be drawn from the evidence" (*Butler v New York State Olympic Regional Dev. Auth.*, 292 AD2d 748, 750 [2002] [emphasis omitted]). To grant such a motion, the trial court must conclude that " 'based on the evidence presented, there is no rational process by which a jury could find for the nonmoving party' " (*Fontanas v Wilson*, 300 AD2d 808, 808 [2002], quoting *Clemente v Impastato*, 274 AD2d 771, 773 [2000]). To set aside the verdict pursuant to CPLR 4404 (a), the trial court must "conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). Where, as here, plaintiffs further argued that the verdict was against the weight of the evidence, it must be shown that " 'the evidence so preponderated in favor of the [plaintiff] that the verdict could not have been reached on any fair interpretation of the evidence' " (*Zeigler v Wolfert's Roost Country Club*, 291 AD2d 609, 610 [2002], quoting *Hess v Dart*, 282 AD2d 810, 811 [2001]; *accord Lolik v Big V Supermarkets*, 86 NY2d 744, 746 [1995]).

It is within these parameters that we review the record evidence. Clearly, to establish a case of prima facie negligence, plaintiffs had to demonstrate that defendants had actual or constructive notice of the dangerous condition existing on the hillside (*see Smith v Smith*, 289 AD2d 919, 920 [2001]; *Boyko v Limowski*, 223 AD2d 962, 964 [1996]). By asserting the act of God defense, the burden now fell upon defendants (*see Prashant Enters. v State of New York*, 206 AD2d 729, 730

[1994]) to show that "'those losses and injuries [were] occasioned exclusively by natural causes, such as could not be prevented by human care, skill and foresight. * * * If there be any co-operation of man, or any admixture of human means, the injury is not, in a legal sense, the act of God'" (*id.* at 730, quoting *Michaels v New York Cent. R.R. Co.*, 30 NY 564, 571 [1864]). Accordingly, if it was shown that defendants had actual or constructive notice of a dangerous condition, they would be unable to assert the act of God defense.

We find the evidence sufficient to establish a valid line of reasoning and a rational process by which this jury could have determined that defendants lacked notice of a dangerous condition on the hillside. With respect to actual notice, the evidence at trial focused on the two letters written by Jacobs to Duci. At trial, Jacobs testified that the purpose of the July 11, 1994 letter was to address the mud flow that he observed over the crib wall which he attributed to the excavating activities on Old Veeder Road. Jacobs' second letter, dated April 19, 1995, stated that "[t]he embankment directly adjacent and to the rear of my property * * * is being continually undermined." Jacobs testified that his concern in writing both of these letters was to address the mud and debris observed to fall on his property as a result of the use of Old Veeder Road; the letters were intended to address the stability of the crib wall. Jacobs also testified that in 1990 he hired Philip Rubins, an engineer, to inspect the crib wall and its stability; he never asked Rubins to analyze the stability of the hillside. Testimony further revealed that Jacobs later hired another engineer, Vernon Hoffman, for the same purpose when he was directed by the Department of Environmental Conservation to remove old tanks on his property. Accordingly, Jacobs' reference in the July 1994 letter to safeguarding "over 500 feet of land hanging over the head of my business" was properly identified by witnesses to reference the crib wall since the length of the gas station property which ran in front of such wall measured approximately 500 feet.

Sharon Jordan, who inspected the property in conjunction with other City officials, testified that she always understood Jacobs' references to the "embankment" to mean the crib wall and that the area of concern was not where the mudslide occurred. Deposition testimony of other City officials inspecting the property at the request of Duci confirmed Jordan's testimony. Raymond Lynch, Robin Finn and Richard Bailor, all of whom worked for MHA, testified that Jacobs never expressed any concerns about the hillside, only the stability of the crib wall. Bernard Mulligan, who worked for Bennett, gave similar

testimony. While Duci testified at trial that his concern regarding, inter alia, the stability of the hillside was triggered by Jacobs' letters, his deposition testimony was inconsistent.

With respect to constructive notice, both plaintiffs and defendants presented expert testimony from civil engineers. Gregory Gifford, plaintiffs' expert, testified that a visual inspection of the hillside should have put defendants on notice that it was unstable. Defendants' expert, Carsten Floess, testified directly to the contrary by noting that the hillside appeared stable since there were no cracks in the ground and no broken utility lines. Floess, who had an extensive background in providing analyses regarding soil mechanics, slope stability and the performance of embankments, specifically refuted each and every factor considered by Gifford in formulating his opinion. Floess emphasized that as a result of weather conditions, there were two other slopes in the area that failed on that day. Floess concluded that the event was "caused by an unusual precipitation, snowmelt, frozen ground, thaw event that generated enormous quantities of water * * * which triggered the landslide." His testimony thereafter focused on the specific effect that extreme weather conditions can have on soil and how such conditions can effect the stability of slopes. Philip Falconer, a certified meteorologist, further supported Floess' theory, testifying that the winds on such day reached up to 71 miles per hour and that the convergence of all four elements— precipitation, wind, wind direction and temperature—in the late evening and early afternoon made its cumulative effects "rare, unusual [and] unforeseeable."

Hence, even recognizing the evidence supporting plaintiffs' contentions regarding the issue of notice, we find that in viewing the evidence in the light most favorable to defendants (*see Butler v New York State Olympic Regional Dev. Auth.*, 292 AD2d 748, 750 [2002], *supra*), there exists a valid line of reasoning and a rational process by which the jury could have made its determination. Moreover, affording defendants the benefit of every favorable inference that may reasonably be drawn from the evidence (*see Pyptiuk v Kramer*, 295 AD2d 768, 770 [2002]), we cannot conclude that the jury's finding was against the weight of the evidence.

We next address plaintiffs' contentions that the act of God defense should have been subsumed into the negligence question and that the placement of such defense on the verdict sheet was both confusing and prejudicial, even after Supreme Court charged the jury on the applicable law. It is settled that a new trial will only be ordered where " 'the jury was substan-

tially confused * * * and was thus unable to make a proper determination upon adequate consideration of the evidence' " (*McElroy v Yousuf*, 268 AD2d 733, 735 [2000], quoting *Dunn v Moss*, 193 AD2d 983, 985 [1993]; *see Mosher v Murell*, 295 AD2d 729, 731 [2002], *lv denied* 98 NY2d 613 [2002]). At the charge conference, Frank solely contended that the act of God question should be subsumed into the negligence question; Tiscione only challenged the sufficiency of defendants' proffer to even warrant a charge on the act of God defense. Notwithstanding plaintiffs' failure to adequately object to the issues raised on appeal concerning both the verdict sheet and the court's charge (*see* CPLR 4110-b; *Pyptiuk v Kramer*, *supra* at 771), these matters will be considered in the exercise of our discretion (*see Progressive Cas. Ins. Co. v Baker*, 290 AD2d 676, 677 [2002]).

We reject Frank's assertion that the act of God defense should have been subsumed into the negligence question. Such defense is an affirmative defense which defendants bore the burden to prove (*see Prashant Enters. v State of New York*, 206 AD2d 729, 730 [1994], *supra*). In so doing, they had to demonstrate that the "act of God" was "the sole and immediate cause of the injury" (*Michaels v New York Cent. R.R. Co.*, 30 NY 564, 571 [1864], *supra*) and that they were free from any contributory negligence (*see Barnet v New York Cent. & Hudson Riv. R.R. Co.*, 222 NY 195, 199 [1918]). As such a finding could be determinative, we conclude that Supreme Court did not err either in its separation of the issue for determination or in its placement of the question on the verdict sheet (*see McElroy v Yousuf*, *supra* at 735).

Finally, addressing Supreme Court's charge on the defense, plaintiffs contend that defendants were required to prove that the *mudslide* was an act of God and not *caused* by an act of God. We disagree and fail to find any error. Defendants' theory was that the convergence of warm temperatures, rapid snowmelt, heavy rain and strong winds on that day caused a mudslide not only at this property, but also at several others in the area—an event which was severe, unusual and wholly unforeseeable. With geological testimony to support such theory, coupled with undisputed meteorological testimony as to the unique meteorological significance of such convergence on that day, we can find no error in the court's charge.

Cardona, P.J., Spain, Carpinello and Kane, JJ., concur. Ordered that the order and judgment is affirmed, without costs.