[777 NYS2d 103]

Siobhan McDermott et al., Respondents, v Coffee Beanery, Ltd., Defendant, and Love and Quiches Desserts, Appellant. (And a Third-Party Action.)

First Department, May 20, 2004

### APPEARANCES OF COUNSEL

*Goldman & Grossman* (*Eleanor R. Goldman* and *Jay S. Grossman* of counsel), for appellant.

*William D. Fireman* for respondents.

### OPINION OF THE COURT

NARDELLI, J.P.

In this appeal, we are asked to determine, inter alia, whether the trial court erred when it granted plaintiffs' posttrial motion to set aside the jury verdict in favor of defendant Love and Quiches Desserts, as against the weight of the evidence, and remanded the matter for a new trial on the issue of proximate cause and damages.

### *Overview*

Plaintiff Siobhan McDermott[1] commenced this personal injury action in February 2000 against defendant Coffee Beanery, Ltd. (Coffee Beanery), and thereafter served a supplemental summons and amended complaint, in November 2001, naming defendant Love and Quiches Desserts (Love and Quiches) as a direct defendant. Plaintiff alleged that on February 15, 1999, she purchased a brownie at the Coffee Beanery store located in the East End Terminal of LaGuardia Airport in Queens County, New York. Plaintiff asserted that the brownie, which was baked and distributed by Love and Quiches, contained the tip of a metal blade, which measured approximately one inch in length,

---

1.  Ms. McDermott's husband, James D. Williams, Jr., is also a named plaintiff in this action. Mr. Williams' claim, however, for the loss of his wife's services and consortium, is not relevant to the issues raised on this appeal and will not be addressed.

and that when she bit into the brownie, she sustained injury to a tooth, which precipitated a cascade of other personal maladies. Plaintiff settled her claims against the Coffee Beanery prior to trial.

### Plaintiffs' Case

The matter proceeded to trial in May 2003, at which time plaintiff, a 37-year-old fund-raising consultant for nonprofit organizations, testified that on February 15, 1999, she was at LaGuardia Airport awaiting a flight to Greenville, South Carolina, in order to see a client. Plaintiff averred that she entered the Coffee Beanery to purchase a snack for the trip and noticed certain food items, including the brownies, in a glass display. Plaintiff ordered a brownie and a biscotti, and a store employee took a precut piece of the brownies, which plaintiff described as approximately two inches by two inches, and placed it in a piece of wax paper and then in a paper bag.

Plaintiff testified that she then proceeded to the boarding gate, sat down to wait for her row to be called, opened the bag, broke off a piece of brownie, and put it in her mouth. Plaintiff asserted that when she bit down, she felt something sharp and immediately spit the brownie out into her hand. Plaintiff purportedly observed a small piece of brownie and a one-inch-long metal blade, which she placed back into the bag and then into her suitcase.

Plaintiff continued on her trip, spending "two to three days" in South Carolina, without seeking any medical treatment until her return to New York, when she saw her regular dentist, Dr. Steven Keeling, on February 22, 1999, one week after the initial occurrence. Plaintiff testified that she complained of sharp pain in her next to last molar on the bottom right side (tooth number 30), sensitivity to hot and cold in that tooth, and pain when she bit down to chew. Dr. Keeling, believing that perhaps a small piece of enamel may have chipped away, did not treat the tooth and indicated that the sensitivity might subside in a couple of days. Dr. Keeling, when the sensitivity did not abate, subsequently put an enamel coating on the tooth, but this also failed to alleviate the problem.

Plaintiff then underwent four unsuccessful root canal procedures, after which the tooth was removed by Dr. Josh Perry, an oral surgeon. Plaintiff, following the extraction, developed a "dry socket," a condition in which blood does not coagulate over the wound, which led to several weeks of "unbe-

lievably painful'' treatment. Plaintiff eventually underwent surgery for a titanium implant in her jaw by another oral surgeon, Dr. Yale Kroll, and a tooth was installed by Dr. Keeling on that implant.

Plaintiff maintained that during the course of this dental treatment, which lasted several months, she developed an inflammation of her jaw and serious pain which began in the jaw and radiated over her face, head, neck and shoulder, which she claimed was temporomandibular joint disorder (TMJ). Plaintiff sought treatment for this condition from a Dr. Donald Tannenbaum, who prepared a bite-plate to help plaintiff sleep, placed her on a course of physical therapy, and prescribed anti-inflammatory medication and muscle relaxants.

Plaintiff further testified that as a result of her ongoing medical treatment, she developed a gastrointestinal problem, consisting of severe intestinal pain, uncontrollable diarrhea and nausea. Plaintiff's primary care physician, Dr. Mark Horowitz, advised her that she had a type of colitis known as c dif colitis, which was caused by the large amount of antibiotics she had been prescribed during the course of her various medical treatments, and referred her to a gastroenterologist, Dr. Simon Lichtiger. Dr. Lichtiger performed a number of tests, including endoscopies and colonoscopies, and treated her with anti-inflammatory medications, more antibiotics, and anticramping medications. A second gastroenterologist, Dr. Asher Kornbluth, prescribed an alternative series of medications and recommended plaintiff see a nutritionist. The colitis resolved itself after approximately six months.

Plaintiff, on cross-examination, acknowledged that: after she bit into the brownie, she experienced discomfort, but no pain; a filling had been put in the tooth many years earlier, but she had had no problem with that tooth for 15 years; she was not diagnosed with TMJ until approximately eight months after the incident; and the colitis condition was also not diagnosed until approximately eight months after the episode, although she denied one doctor told her she had irritable bowel syndrome, or that any of her doctors told her the condition was nerve-related.

Plaintiff averred that the colitis, the most extreme symptoms of which had subsided by the summer of 2000, caused her to have problems sitting for long periods of time, to jump off buses in order to use a bathroom due to severe diarrhea, and to have difficulty eating and socializing. Plaintiff, however, admitted that she did a lot of traveling for both business and pleasure,

and that she and her husband rented a house in Montauk for the summers of 1999 and 2000, flew to St. Thomas in May 2000, and Ireland in July 2000. Plaintiff further conceded that in 2001, while still suffering from TMJ, she went on a scuba-diving trip to Thailand, visited Cambodia, and flew to London and Paris.

Mr. Stephen Roman, an "area director" for the Coffee Beanery at the time in question, testified that: the store in which plaintiff purchased the brownie was under his supervision; all baked goods, including brownies, were purchased precut or presliced, from outside vendors; the only items the Coffee Beanery cut or sliced on premises were bagels, for which a serrated knife was used; and in February 1999, the Coffee Beanery purchased all of its brownies from Love and Quiches, which delivered them in 24 precut, preportioned pieces per tray. Mr. Roman stated that when products were delivered, they were not inspected other than to check the quantity against the invoice and, if the inventory in the Coffee Beanery became too substantial, the brownies would be frozen until needed, but never separated with a knife when thawed. Mr. Roman also examined the brownie with the blade purchased by plaintiff, and noted that it looked like the end of a mixing beater blade, which the Coffee Beanery did not have, and not like the serrated knives used by the store.

Mr. Andrew Axelrod, the secretary-treasurer of Love and Quiches, testified that the company was a wholesale manufacturer of baked goods and that one of the retailers it supplied was the Coffee Beanery. Mr. Axelrod described the process of making the brownies, including the initial steps in which bags of ingredients were sliced or cut open with knives. Mr. Axelrod indicated, however, that various safety features were in place, such as requiring employees to remove their jewelry, not permitting box cutters on the baking floor, and having five metal detectors in place along the packaging line to determine if the finished product contained any metal prior to distribution. Finally, Mr. Axelrod had no specific logs documenting when, or if, the metal detectors were tested, and was unaware if the metal detectors had ever detected metal prior to February 1999.

Mr. Richard Bolmer, who had extensive experience in quality control in the baking industry, testified that he examined the piece of metal plaintiff bit into, and it was his opinion that the metal was introduced in the raw batter state before being baked, which was evidenced by batter still adhering to pits inside the

metal despite the passage of four years. Mr. Bolmer further stated that industry standards require that metal detectors be checked every 30 minutes, but in his visit to Love and Quiches, which lasted just under two hours, Mr. Bolmer noted that the detectors were never checked, although he stated, on cross-examination, that he did not check the detectors or their calibrations. Mr. Bolmer opined that Love and Quiches was operated like "a mom and pop shop" and "[t]here were safety standards . . . that were unconditioned and uncontrolled. There were no knives in sheaths . . . there was no quality assurance people. There were no checks being made." With respect to the piece of metal in question, Mr. Bolmer stated it looked like the end of a popular knife used in the 1980s and 1990s, and that during his visit to Love and Quiches, he saw only two knives, which were serrated.

Dr. Steven Keeling testified that he is plaintiff's treating dentist and saw her on an emergency visit on February 22, 1999. Plaintiff, on that date, explained that one week prior she had bitten into a pastry with a metal blade in it and that she had felt a jolt, and had pain in the lower right first molar. The tooth in question had a silver (amalgam) filling in it for many years with no previous complaints. Dr. Keeling stated that he examined the tooth with a fiberoptic light and could see no external fractures, so he recommended plaintiff take it easy on the tooth for one week to ascertain whether the soreness would subside.

Plaintiff again visited Dr. Keeling on March 18, 1999, at which time she asserted that the tooth was still painful and sensitive to cold. Dr. Keeling removed the filling and while there was no decay, he found a crack in the inner part of the tooth. Dr. Keeling opined that the crack in the tooth was a result of the trauma from biting down on the piece of metal, and that he then treated the tooth with a type of filling which contained a medicine designed to sedate the tooth.

Plaintiff's next visit to Dr. Keeling took place on April 13, 1999, when she complained of continuing pain while chewing. Dr. Keeling placed a temporary crown on the tooth, and when that did not alleviate the problem, plaintiff underwent a root canal procedure over three visits on April 29, 1999, May 27, 1999 and June 25, 1999, and was placed on antibiotics. The root canal therapy, however, was also unsuccessful and on July 12, 1999, the tooth was removed by Dr. Josh Perry, an oral surgeon. Dr. Keeling opined that the extraction was very difficult as the

tooth fractured and crumbled into tiny pieces. Dr. Keeling stated that the tooth was probably in a weakened condition due to the endodontic treatment and because there were still some fractures in the root as a result of the incident in question.

Dr. Keeling noted that plaintiff also developed a postoperative complication known as dry socket, in which the extraction area does not heal properly. This resulted in four to five weeks of treatment, during which the oral surgeon cleaned out the wound and treated it with medication.

Dr. Keeling averred that in August 1999, plaintiff began to develop chronic facial pain and TMJ, which was possibly due to changes in muscular behavior from chewing unevenly and favoring her left side. Dr. Tannenbaum, who treated plaintiff for the TMJ, manufactured an appliance for plaintiff to wear at night to balance her bite, and indicated in a letter contained in Dr. Keeling's file for plaintiff that the trauma of biting on the metal blade "was a precipitator of the scenario that subsequently ensued."

Dr. Keeling, in April 2000, decided that plaintiff was ready for an implant, and explained that an oral surgeon placed a titanium screw in the jawbone, over which a permanent crown would eventually be placed. Dr. Keeling concluded that the ultimate cause of the loss of the tooth was from plaintiff biting on metal with mistaken force, which resulted in fractures in the tooth.

On cross-examination, Dr. Keeling acknowledged that the filling in the tooth was there because plaintiff had decay in the tooth as a teenager and that he saw only one internal crack after removing the filling, and observed no cracks on the outside enamel. Dr. Keeling averred that the fracture was "simple" in the beginning, and when questioned as to whether the fracture became more complicated, stated that he was only able to visually confirm the crack he observed, and could not see the trunk or root system of an individual tooth.

Dr. Mark Horowitz testified that he had been plaintiff's internist since 1995, and that plaintiff had had no serious gastrointestinal problems between 1995 and 1999. Dr. Horowitz stated that he saw plaintiff on September 23, 1999, at which time she complained of several months of diarrhea and nausea following multiple courses of antibiotics, including clindamycin. Dr. Horowitz concluded that plaintiff was suffering from a type of colitis, which is a bacterial infection of the bowels, and opined that the cause of the colitis was the administration of the two

courses of clindamycin. Dr. Horowitz referred plaintiff to a gastroenterologist, Dr. Simon Lichtiger, who informed Dr. Horowitz that plaintiff had a bowel disorder induced by the antibiotics. Dr. Lichtiger performed an endoscopy and colonoscopy, which were normal, and plaintiff was again put on medication.

Dr. Horowitz, upon discovering in November 1999 that plaintiff's symptoms persisted, subsequently referred her to a second gastroenterologist, Dr. Asher Kornbluth. Dr. Kornbluth, in December 1999, diagnosed a possible irritable bowel syndrome with associated anxiety and depression, and he continued plaintiff on a variety of medications, including Paxil, an antidepressant. Plaintiff also began seeing a nutritionist in Dr. Kornbluth's office and by February 2000, plaintiff was feeling substantially better and her medications were eventually stopped.

Dr. Horowitz, on cross-examination, admitted that plaintiff tested negative for colitis in September 1999 and November 1999, and that he was unaware when plaintiff was given the courses of clindamycin, which he had indicated probably caused the colitis he could not confirm. Dr. Horowitz, regarding Dr. Kornbluth's notes, acknowledged that there was no indication in those notes that plaintiff was suffering from any type of colitis.

### Defendant's Case

Mr. William Leong, a metallurgical engineer, testified that the piece of metal in question was slightly less than three quarters of an inch long, and that it had a curved, sharpened edge, indicating that it was the tip of a knife blade. Mr. Leong stated that results of a chemical analysis indicated that the metal fragment was ordinary, household stainless steel and that the knife blade would have been no more than five or six inches long, and of a type that would be used in a household to cut bread and other items. Mr. Leong also testified that he visited the Love and Quiches baking facility and did not observe anything that resembled the piece of metal he tested. Mr. Leong did acknowledge, on cross-examination, that he was only shown around certain locations and not given a tour of the entire process.

Dr. Joseph Sweeting, an internist with a speciality in gastroenterology, testified that he reviewed Dr. Lichtiger's, Dr. Kornbluth's, and Dr. Horowitz's records and examined plaintiff on January 31, 2002. Dr. Sweeting stated that at the time of the examination, plaintiff was not suffering from colitis and was

otherwise normal. Dr. Sweeting noted that plaintiff had undergone three stool tests between September 1999 and August 2000, all of which produced negative results for clostridium difficile colitis. Dr. Sweeting further noted that plaintiff's colonoscopy also produced negative results, and that if a patient had active clostridium difficile colitis, the colonoscopy would reveal it. Dr. Sweeting opined that plaintiff's symptoms could have been compatible with irritable bowel syndrome, although he could not rule out the possibility that plaintiff had colitis at some stage. Colitis, however, is, according to Dr. Sweeting's testimony, normally cured in a short period of time and that it is "almost unheard of medically for colitis to persist for a year or a year and one-half."

Dr. Stanley Lane, an oral surgeon, was defendant's next and final witness. Prior to his testimony, however, plaintiff moved for a directed verdict on liability under the theories of res ipsa loquitur, strict products liability and negligence. Plaintiff argued that the product originated at Love and Quiches, the piece of metal entered the product at Love and Quiches, and the product was inherently dangerous when it was placed into the stream of commerce by Love and Quiches. Love and Quiches, likewise, moved for a directed verdict and asserted that plaintiff failed to establish that the metal was introduced into the brownie at the Love and Quiches factory, as none of the knives used there were of that type. Further, Love and Quiches noted that the Coffee Beanery handled the product for 10 days prior to the sale to plaintiff, and there were knives at that store used to cut bagels. The trial court, at that juncture, reserved judgment on both motions.

Dr. Lane testified that he examined plaintiff on November 29, 2001, and also took a history from her regarding the incident with the brownie, her extensive dental treatment thereafter, and her claim that she suffered from TMJ. Dr. Lane opined that the prosthetic tooth looked natural and was a "perfect repair."

With regard to plaintiff's jaw and jaw joint, Dr. Lane noted plaintiff's subjective complaints of pain on both sides of her jaw but, when he listened as plaintiff opened and closed her mouth, Dr. Lane could not hear anything audible indicating a rip or tear in the cartilage in the jaw joint, or that the cartilage was in an abnormal position. Dr. Lane also performed pressure and palpitation tests on the muscles bilaterally, which indicated no response to pain and normal function. Dr. Lane additionally analyzed plaintiff's jaw function and concluded she had normal

range of motion, both up and down and side to side. Plaintiff was also able to move her eyes, nose, lips and mouth, indicating no abnormality existed with plaintiff's seventh facial nerve or with the sensory nerves in her face. Dr. Lane further recalled that plaintiff did not first complain of jaw pain until eight months after the accident.

Dr. Lane averred that he reviewed x-rays taken by a number of doctors, including the dentist, oral surgeons, and the TMJ specialist, who treated plaintiff. According to Dr. Lane's testimony, x-rays taken on June 30, 1999 indicated that the jaw joint was normal, and that subsequent CT scans taken in October 1999 echoed that finding. Dr. Lane stated that x-rays taken in July 1999 showed that the area around the end of the root canal, on both sides of the tooth, seemed to have some change or infection, leading him to believe that the cavity originally present in the tooth had gone through the tooth into the nerve.

Dr. Lane characterized silver fillings as "old fashioned," and explained that silver fillings never attach to a tooth and, as time passes, they chip and shrink, leaving gaps. Dr. Lane opined that "[t]his wasn't a trauma crack. This wasn't a break from biting on something . . . [T]he tooth was coming out . . . because there was infection in the root canal." Dr. Lane added that the infection came from the mouth and seeped in along the silver filling, and that the July 1999 x-rays did not show a crack or break in the tooth. Dr. Lane concluded that the loss of the tooth was not trauma-related, "but technique and poor outcome that is a risk of endodontic therapy."

Dr. Lane further opined that there was only subjective proof of TMJ, and there were no residuals of any intraoral, TM joint or dental injury that were related to the February 1999 incident. On cross-examination, Dr. Lane acknowledged that he did not know what caused the internal crack, but stated he had an opinion, which opinion plaintiff's counsel chose not to pursue. It is clear from the direct and redirect testimony, however, that Dr. Lane's opinion was that the crack, the need for root canal therapy, and the eventual removal of the tooth, all stemmed from normal decay introduced as the result of an old, inadequate silver filling.

At the conclusion of Dr. Lane's testimony, and prior to the beginning of summations, the trial court granted plaintiff's motion for a directed verdict as to liability on the grounds of strict tort liability and negligence. The trial court denied Love and

Quiches' motion for a directed verdict. The attorneys delivered their summations, and the trial court charged the jury and gave it a written verdict sheet. The first question on the verdict sheet (Question 1A) inquired: "Was the defendant love and quiches desserts' product defective?" This question was given to the jury with the answer "yes" already printed on the form by virtue of the trial court's award of a directed verdict on the issue of liability to plaintiff. Question 1B queried: "Was the defective product of the defendant love and quiches desserts a substantial factor in causing the plaintiff Siobhan McDermott's injury?" The verdict sheet instructed the jury that "If your answer to question 1b is no, then proceed no further and report your verdict to the court."

On May 29, 2003, the jury, after due deliberation, returned a unanimous verdict in which Question 1B was answered in the negative. Plaintiff subsequently moved for an order setting aside the verdict and directing judgment in her favor on the issue of proximate cause or, in the alternative, setting aside the verdict and remanding the matter for a new trial on the issues of proximate cause and damages, on the ground that the jury's verdict was against the weight of the credible evidence.

The trial court granted plaintiff's motion to the extent of setting side the verdict as against the weight of the evidence, and remanded the matter for a new trial on the issues of proximate cause and damages. Love and Quiches now appeals from both the trial court's order directing a new trial, and its presummation determination that its product was defective as a matter of law.

## The Law

The court's authority to set aside a verdict as against the weight of the evidence and order a new trial is an inherent one[2] and demands a discretionary balancing of many factors (*Doyle v Seney*, 221 AD2d 828, 830 [1995]; *Green v City of New York*, 138 AD2d 676 [1988]; Siegel, NY Prac § 406, at 657 [3d ed]). Such authority is codified in CPLR 4404 (a), which provides, in pertinent part, that: "the court may set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it

---

**2.** In *Annunziata v Colasanti* (126 AD2d 75 [1987]), Justice Sullivan of this Court noted that the trial court's power "derives from the judicial system's obligation to protect its integrity against the taint of a clearly erroneous verdict" (*id.* at 79-80).

may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence . . ."

While the statutory standard has been characterized as an elusive one which has "long defied precise definition" (*Nicastro v Park*, 113 AD2d 129, 132 [1985]; *see also Niewieroski v National Cleaning Contrs.*, 126 AD2d 424 [1987], *lv denied* 70 NY2d 602 [1987]), it is a settled rule that a jury verdict should not be set aside as against the weight of the evidence unless the jury could not have reached its verdict on any fair interpretation of the evidence[3] (*see Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *Goldstein v Snyder*, 3 AD3d 332 [2004]; *Kennedy v New York City Health & Hosps. Corp.*, 300 AD2d 146 [2002]; *Bernstein v Red Apple Supermarkets*, 227 AD2d 264, 265 [1996], *lv dismissed* 89 NY2d 961 [1997]; *Teneriello v Travelers Cos.*, 264 AD2d 772 [1999], *lv denied* 94 NY2d 758 [2000]; *Green v City of New York, supra* at 676; *Nicastro v Park, supra* at 135; Weinstein-Korn-Miller, NY Civ Prac ¶ 4404.09).

In making this determination, the court must proceed with considerable caution, "for in the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict" (*Nicastro v Park, supra* at 133; *see also Schray v Amerada Hess Corp.*, 297 AD2d 339 [2002]). Indeed, the court must cautiously balance " 'the great deference to be accorded to the jury's conclusion' . . . against the court's own obligation to assure that the verdict is fair" (*Fontana v Kurian*, 214 AD2d 832, 833 [1995] [citations omitted], *lv denied* 86 NY2d 707 [1995]), and the court may not employ its discretion simply because it disagrees with a verdict, as this would " 'unnecessarily interfere with the fact-finding function of the jury to a degree that amounts to an usurpation of the jury's duty' " (*Pena v New York City Tr. Auth.*, 185 AD2d 794, 795 [1992], quoting *Ellis v Hoelzel*, 57 AD2d 968, 969 [1977]).

Particular deference is to be accorded a jury verdict in favor of a defendant in a tort action (*Nicastro v Park, supra* at 134; Weinstein-Korn-Miller, NY Civ Prac ¶ 4404.09; Siegel, NY Prac

---

**3.** This standard stands in contrast to a determination that a jury verdict is not supported by sufficient evidence, because such a finding leads to the harsh result of a directed verdict terminating the action. In that instance, there must be "no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *see also Kennedy v New York City Health & Hosps. Corp.*, 300 AD2d 146, 147 [2002]; *Nicastro v Park, supra* at 132).

§ 406, at 657 [3d ed]), especially if the resolution of the case turns on the evaluation of the conflicting testimony of expert witnesses (*Fontana v Kurian, supra* at 833). The resolution of such a conflict rests with the jury, and not the court (*Wierzbicki v Kristel*, 192 AD2d 906, 908 [1993]; *Jones v Schockett*, 109 AD2d 821, 822 [1985]; *see also Gamiel v University Hosp.*, 216 AD2d 80, 81 [1995], *lv dismissed* 87 NY2d 911 [1996]), and the jury is entitled to accept, or reject, an expert's testimony in whole or in part (*Mejia v JMM Audubon*, 1 AD3d 261 [2003]).

## Discussion

Bearing these principles in mind, we find that there was ample evidence to support a jury verdict in Love and Quiches' favor. The jury was certainly entitled to credit the testimony of Dr. Lane, who examined plaintiff and reviewed x-ray films of her mouth and jaw taken both before and after the tooth was removed. Dr. Lane opined that: plaintiff's complications with the tooth were not trauma-related, noting that x-rays taken prior to the tooth's removal indicated no cracks or breaks but, rather, that an infection seeped in along an old silver filling, eventually traveling to the root, requiring root canal therapy; the tooth came out in pieces during the extraction not because of previous trauma, but because the tooth was dead due to the root canal; and a crack in a tooth from biting on something hard would result in immediate pain, in contrast to plaintiff's description of initial discomfort at the time of the incident, which was more of an indication of decomposition of the filling.

Moreover, plaintiff's dentist, Dr. Keeling, testified that he did not discover the crack in the tooth until after he drilled out the old, silver filling, which occurred more than one month after the incident with the brownie, and although he related the crack to the trauma of biting on metal, it was unquestionably within the province of the jury to give Dr. Lane's testimony more weight in view of the delay in finding the damage to the tooth, the inconclusive x-rays, and Dr. Keeling's acknowledgment that a root canal specialist could find no fractures in any of the root systems. Dr. Lane further opined that there was no structural, but only subjective proof of TMJ and although this conflicted with Dr. Keeling's conclusions, the jury did not act improperly in crediting Dr. Lane's testimony.

Finally, with respect to plaintiff's claim of colitis, the jury heard testimony that plaintiff underwent three stool tests, the standard diagnostic for colitis, all of which produced negative

results, as well as a colonoscopy, which was also negative for colitis. Moreover, defendant's gastroenterologist testified that the type of colitis allegedly afflicting plaintiff was normally treated and cured in a short period of time and that following several months of unsuccessful treatment, Dr. Kornbluth, a gastroenterologist who had treated plaintiff, diagnosed a probable irritable bowel syndrome with associated anxiety and depression. In view of the foregoing, questions were raised for the jury not only as to whether the colitis was related to the incident, but also whether plaintiff, in fact, had ever suffered from colitis.[4]

In view of all of the foregoing, we hold that the trial court's order setting aside the verdict as against the weight of the evidence was unwarranted as it cannot be said that the findings of the jury could not have been reached on any fair interpretation of the evidence.

Accordingly, the order of the Supreme Court, New York County (Ralph Boniello, J.), entered June 11, 2003, which, following a jury trial, granted plaintiffs' motion to set aside the verdict in favor of defendant Love and Quiches as against the weight of the evidence, and remanded the matter for a new trial on the issues of proximate cause and damages, should be reversed, on the law, the facts and in the exercise of discretion, without costs, plaintiffs' motion denied and the jury verdict reinstated.

SAXE, J. (concurring). This case illustrates the confusion and difficulty that can arise when a trial court encroaches on the jury's task of assessing the evidence and making findings of fact.

I agree with my colleagues that there was an ample evidentiary basis to support the jury's finding in defendant's favor on the issue of proximate cause, and that therefore the order setting aside the verdict and remanding for a new trial should be reversed. However, in addition to reversing the jury's finding on causation, in one other respect the trial court improperly usurped the jury's function and injected its own view of the evidence, by directing a verdict on the issue of negligence. I believe this error must be highlighted in order to lay out a framework

---

4. The jury, it must be remembered, also heard testimony that plaintiff was able to make several business trips, and took a number of vacations, including one that had her scuba diving in Thailand and traveling through Cambodia.

in which to consider when circumstances are appropriate for directed verdicts in personal injury litigation.

Plaintiff's claim is that when biting into a brownie purchased at defendant Coffee Beanery, Ltd.'s kiosk, she injured herself on a one-inch-long piece of metal blade hidden in the brownie. Coffee Beanery obtained brownies from defendant Love and Quiches, a wholesale supplier of baked goods. The claimed injuries included: damage to the tooth requiring four root canal procedures, extraction of the tooth, a subsequent condition known as "dry socket," development of temporomandibular joint problems requiring a bite-plate, physical therapy, anti-inflammatory medication and muscle relaxants, and, ultimately, gastrointestinal problems resulting in colitis, assertedly the result of medications taken in the course of treating the tooth.

It goes without saying that Love and Quiches could not affirmatively disprove plaintiff's claim that the piece of metal had been in its brownie; nor could it definitively prove its contention that the piece of metal entered the brownie at the Coffee Beanery rather than in the baking process. Its defense relied primarily on its dental expert's conclusion that the problem within the tooth was not related to plaintiff biting on the metal blade, but was, instead, related to the breakdown of the old silver amalgam filling in the tooth, combined with stress on the tooth aggravated by the endodontic work; Love and Quiches also focused on the absence of any apparent immediate problem from the incident, the belated appearance of the alleged complications, the lack of a consensus among experts regarding the correct diagnoses, and the fact that some of plaintiff's activities belied her claims of ongoing physiological difficulties.

At the close of her direct case, plaintiff moved for a directed verdict as to liability, arguing that the presence of the piece of metal in the brownie sold by Love and Quiches was established and was necessarily the result of negligence. The trial court agreed and granted plaintiff's motion for a directed verdict insofar as it determined that Love and Quiches was liable for producing a defective product, in negligence and under a theory of strict liability. It therefore gave the jury a verdict sheet in which the first question, "Was the defendant love and quiches desserts' product defective?" was already answered "Yes." The jury then proceeded to answer "No" to the proximate cause question of whether the defective product was a substantial factor in causing the plaintiff's injury.

This verdict troubled the trial court sufficiently to prompt it to set aside the verdict and order a new trial. In other words,

the court, having itself concluded that the evidence established that defendant had been negligent, could not accept the jury's finding that defendant was not liable. But the conundrum was of the court's own making, and reflected a fundamental error on the part of the court.

The trial court's decision to direct a verdict was at the bottom of the problem here. A directed verdict is only appropriate where, "upon the evidence presented, there is no rational process by which the fact trier could base a finding in favor of the nonmoving party" (*Holt v Welding Servs.*, 264 AD2d 562, 563 [1999], *lv dismissed* 94 NY2d 899 [2000], quoting *Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]). "[T]he evidence must be viewed in the light most favorable to . . . the nonmovants, and the court must afford [the nonmovants] every favorable inference which may properly be drawn from the evidence" (*Butler v New York State Olympic Regional Dev. Auth.*, 292 AD2d 748, 750 [2002] [emphasis deleted]). In other words, a directed verdict is proper only where there is only one possible conclusion to reach. This was not such a situation.

"Issues of negligence, foreseeability and proximate cause involve the kinds of judgmental variables which have traditionally, and soundly, been left to the finders of fact to resolve even where the facts are essentially undisputed" (*Rotz v City of New York*, 143 AD2d 301, 304 [1988]). The types of "judgmental variables" necessitating submission of an issue of fact to a jury include not only the need to weigh competing evidence, but also the need to assess the credibility of the witnesses. In directing the verdict on negligence, the trial court failed to recognize the presence of an issue of fact regarding plaintiff's credibility.

We must bear in mind that a jury is entitled to simply reject the credibility of any witness, in part or in whole (*see* PJI 1:37 [2003]). The jury need not accept testimony offered by a party simply because the opposing party offered no contrary testimony (*see Brennan v Bauman & Sons Buses*, 107 AD2d 654 [1985]). "If everything or anything had to be believed in court simply because there is no witness to contradict it, the administration of justice would be a pitiable affair" (*see id.* at 655, quoting *Punsky v City of New York*, 129 App Div 558, 559 [1908]). The jury was fully entitled to reject plaintiff's claims in their entirety, if it so chose; it could even have rejected the assertion that there had been a piece of metal in the brownie.

In directing a verdict on the negligence issue, the trial court was in effect finding that the brownie into which plaintiff bit

contained the piece of metal, and that the metal had been present in the brownie at the time it left Love and Quiches' premises. Yet, the jury's rejection of at least some of plaintiff's evidence, in order to find against plaintiff on the issue of proximate cause, was a reminder that it is the jury, not the court, that is the finder of fact, with the authority to accept or reject plaintiff's evidence.

The jury, by finding no proximate cause, may have decided that it believed the view of defendant's dental expert as to causation; or, it could have concluded that plaintiff's injuries did not occur in the way she testified, or found that plaintiff's ailments were psychosomatic rather than resulting from biting into a piece of metal; it could even have rejected plaintiff's assertion that she bit into a piece of metal in the brownie. So, while the jury's conclusion confounded the trial court, this was only because the trial court failed to recognize that the jury had the right and obligation to independently assess evidence and find facts, even when its findings were contrary to those implicitly made by the court.

In fact, any rejection of plaintiff's claims by the jury would have been well-founded, in view of the evidence showing that she lived her normal life for the week following the incident, that when she then visited her dentist, he was unable to observe any damage to the tooth, and that during times in which she claimed to have suffered severe pain and disability, she took part in activities that belied her claims.

The prospect of resolving an issue as a matter of law based upon undisputed evidence is tempting for a court. Indeed, this Court has granted summary judgment based upon fact claims which a defendant could not controvert because no one other than the plaintiff was present at the time (*see e.g. Yurkovich v Kvarner Woodworking*, 289 AD2d 183 [2001]). Yet, where undisputed factual assertions may still be rejected as a matter of credibility, we should guard against bypassing the role of the jury as assessors of the evidence.

Certainly, there are circumstances in which determinations of negligence may properly be made in the context of a directed verdict. Initially, of course, directed verdicts *dismissing* negligence claims are appropriate whenever the court perceives an absence of evidence supporting a finding of negligence (*see e.g. Minor v Triborough Bridge & Tunnel Auth.*, 215 AD2d 218 [1995]).

It may also be appropriate for a trial court to direct a verdict in favor of a plaintiff as to negligence where the defendant was

actually present at the series of events culminating in injury, and is therefore in a position to offer a contrary narrative if one exists, yet failed to contradict the plaintiff's description of events. This occurred in *Karasz v Ship* (180 AD2d 467 [1992]), in which the defendant plastic surgeon failed to contradict the assertion that he had neglected to inform the patient of a potential consequence of the surgery; the directed verdict against him on the issue of liability was therefore held proper (*see also Jackson v Young*, 226 AD2d 230 [1996], *lv denied* 88 NY2d 814 [1996]).

However, the present matter is *not* such a case. In this case, as in most cases, evaluation of the evidence included the obligation to evaluate the credibility of each witness, including plaintiff. The events culminating in plaintiff's injuries were not established facts which defendant could have disputed from personal knowledge of the events. Defendant's inability to directly controvert her assertions, not having been present at the time, should not prevent defendant from calling into question the accuracy or truthfulness of plaintiff's assertions.

Our civil justice system in personal injury cases is based upon the principle that it is the jury that determines issues of fact, "decid[ing] what has or has not been proved" (PJI 1:6 [2003]). It being the task of the jury to make findings of fact, even where the trial court perceives the facts to be entirely one-sided, the far better course is to leave to the jury the initial determination of the essential factual issues of negligence, foreseeability and proximate cause, in which is subsumed the assessment of the witnesses' credibility. Even where the court perceives the facts to be entirely one-sided, it always has the option of thereafter granting a judgment notwithstanding the verdict (CPLR 4404 [a]). This cautious approach to a trial court's independent assessment of the evidence allows for the possibility that the reviewing appellate court will disagree with the trial court's view of the evidence, while protecting against the prospect that a new trial will be required.

MAZZARELLI and LERNER, JJ., concur with NARDELLI, J.P.; SAXE, J., concurs in a separate opinion.

Order Supreme Court, New York County, entered June 11, 2003, reversed, on the law, the facts and in the exercise of discretion, without costs, plaintiffs' motion to set aside the verdict denied and the jury verdict reinstated.