Mejia v Japan Socy., Inc. (2025 NY Slip Op 50119(U))

[*1]

Mejia v Japan Socy., Inc.

2025 NY Slip Op 50119(U)

Decided on February 4, 2025

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 4, 2025
Supreme Court, Bronx County

Wilson Mejia, Plaintiff(s),

against
Japan Society, Inc., Defendant(s).

Index No. 28455/17E

Counsel for Plaintiff: Gorayeb & Associates, PC
Counsel for Japan: Weiser & McCarthy

Fidel E. Gomez, J.

In this action [FN1]
for personal injuries sustained by plaintiff as a result of a fall from a height while working within the premises owned by defendant/third-party plaintiff/second third-party plaintiff JAPAN SOCIETY, INC. (Japan), plaintiff moves seeking an order pursuant to, inter alia, CPLR § 5501(c), granting additur thereby increasing the jury's damages award for pain and suffering damages. Saliently, plaintiff avers that the jury's verdict with respect to pain and suffering damages is inadequate because it materially deviates from what constitutes reasonable compensation for plaintiff's injuries. Japan opposes plaintiff's motion asserting that the jury's verdict with respect to pain and suffering damages is adequate. Japan separately moves seeking an order pursuant to, inter alia, CPLR § 4404(a), setting aside the jury's verdict in the interests of justice [FN2]
. Saliently, Japan avers that the Court committed reversible error when it allowed the jury to review MRI films of plaintiff's cervical and lumbar spine during deliberations without also reading the testimony adduced during the trial with respect to the films. Plaintiff opposes Japan's motion, asserting, inter alia, that when the jury asked to see the foregoing MRI films, which were in evidence, Japan did not object and instead unconditionally agreed to show the jury the films . Thus, plaintiff avers that any claim that the Court committed error has been waived.
For the reasons that follow hereinafter, plaintiff's motion (Motion Sequence # 11) and Japan's motion (Motion Sequence #12) are hereby decided together, plaintiff's motion is granted, and Japan's motion is denied.
The instant action is for personal injuries premised on violations of the Labor Law and on common law negligence. The complaint alleges that on August 2, 2017, plaintiff was injured while working within the premises, inter alia, owned by Japan and located at 333 East 47th Street, New York, NY (333). Prior to the foregoing date, Japan retained second and third third-party defendant BEST LINE CONSTRUCTION (Best) to provide work and labor at 333. Plaintiff was performing work on an elevated surface when he fell therefrom. It is alleged that plaintiff's fall was caused by defendant's negligence as well as by their violations of Labor Law §§ 200, 240(1), 240(2), 240(3), and 241(6).
According to the third-party complaint, pursuant to a written agreement, Japan retained third-party defendant and third third-party plaintiff BMDC CONSTRUCTION LIMITED [FN3]
(BMDC) to perform work at 333. It is alleged that pursuant to the foregoing agreement, BMDC was required to indemnify Japan for plaintiff's claims made against Japan and Best. Accordingly, Japan interposes four causes of action against BMDC, including causes of action for contribution and contractual indemnification. 
According to the second third-party complaint, pursuant to a written agreement BMDC retained Best to perform work at 333. It is alleged that pursuant to the foregoing agreement Best was required to indemnify Japan for the claims made against Japan by plaintiff. Accordingly, Japan interposes three causes of action against Best, including causes of action for common law and contractual indemnification. 
According to the third third-party complaint, BMDC was hired by Japan to perform work at 333. BMDC hired Best to perform some of the work pursuant to a written agreement. Pursuant to the foregoing agreement, Best was required to indemnify both Japan and BMDC for any claims made against Japan by plaintiff and any claims made against BMDC by Japan. Accordingly, BMDC interposes three causes of action against Best, including causes of action for contribution and contractual indemnification.
On November 4, 2022, the Court (Suarez, J., ret.) granted plaintiff's application seeking an order for partial summary judgment. Specifically, the Court held that Japan violated Labor Law § 240(1). The Court also partially granted Best's application seeking summary judgment and dismissal of the second third-party and third third-party actions against it. Specifically, the Court dismissed portions of the second third-party action brought against Best by Japan and dismissed the third third-party action in its entirety.
On February 7, 2024 after a jury trial solely on the issue of damages and proximate causation, the jury rendered a verdict in plaintiff's favor. The jury awarded plaintiff $500,000 for past pain and suffering, $500,000 for future pain and suffering, and $1 million for future medical expenses.
 JAPAN'S MOTION TO SET ASIDE THE VERDICT
Japan's motion to set aside the verdict is denied. Significantly, to the extent that Japan seeks to set aside the verdict in the interests of justice because of an error alleged to have been committed by the Court - showing the jury plaintiff's cervical and lumbar MRI films without the benefit of concomitant explanatory testimony - such course of action was one to which Japan [*2]never objected and, in fact, one to which Japan acquiesced and actually sought. Thus, such alleged error is waived. To the extent that Japan seeks to set aside the jury's award for future medical treatment, not only does Japan fail to support this contention, but the record evinces that said award is actually less than the sum which plaintiff's experts established at trial. Accordingly, the Court treats this portion of Japan's application as one pursuant to CPLR § 4404(a) and the same is denied.

Standard of Review
CPLR § 4404(a) reads:
[a]fter a trial of a cause of action or issue triable of right by a jury, upon the motion of any party or on its own initiative, the court may set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence, in the interest of justice or where the jury cannot agree after being kept together for as long as is deemed reasonable by the court.
Setting aside a jury verdict is within the sound discretion of the trial court and the exercise of such discretion must be accorded great respect (Nicastro v Park, 113 AD2d 129, 136 [2d Dept 1985]). It involves an application of professional judgment gleaned from "the judge's background and experience as a student, practitioner and judge" (id. at 135). Respect for the trial court's discretion in setting aside a verdict, or in the alternative, choosing not to, is mandated because the trial court is in the best position to "properly assess the evidence presented at trial, but also because judicial independence of mind in making that determination is an essential 'ingredient to the sound health of the judicial process'" (id. at 137, quoting, Mann v Hunt, 283 AD 140, 141 [3d Dept 1953]).
Whether a verdict is against the weight of the evidence requires a determination of whether questions of fact were correctly resolved by the trier of fact (Cohen v Hallmark Cards, Inc., 45 NY2d 493, 498 [1978]). The inquiry is so limited because the court "does not have the power to make new findings of fact in a jury case," (id. at 498). Therefore, if the verdict is against the weight of the evidence, the remedy is a new trial (id. at 498). Significantly, a jury verdict shall not be set aside and shall stand unless and until the court concludes that the jury could not have reached the verdict on any fair interpretation of the evidence proffered at trial (Delgado v Board of Education of Union Free School District, 48 NY2d 643, 644 [1979]). Stated differently, a jury verdict should not be set aside unless the court concludes that the evidence presented at trial so preponderates in favor of the moving party that the jury could not have reached its verdict on any fair interpretation of the evidence (Grassi v Ulrich, 87 NY2d 954, 956 [1996]).
In reviewing an application to set aside a jury verdict, the court should be mindful that absent indications that substantial justice has not been done, the successful litigant at trial is entitled to the benefits of a favorable jury verdict (Cholewinski v Wisnicki, 21 AD3d 791, 791 [1st Dept 2005]; Rivera v 4064 Realty Co., 17 AD3d 201, 203 [1st Dept 2005]; McDermott v Coffee Beanery, Ltd., 9 AD3d 195, 206 [1st Dept 2004]). Again, the court should always be guided by the principle that fact finding at trial is the province of the jury and not the trial court (Nicastro at 133), and that, as such, conflicts in the testimony and evidence adduced at trial are solely within the jury's province to resolve (Rivera at 203 ["While there were conflicts in [*3]testimony over the identity of the window guard installer and discrepancies between trial and pretrial testimony, those conflicts and discrepancies were resolved, and properly so, by the jury. In the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict. A trial court may not interfere with the fact-finding function of a jury simply because it disagrees with the verdict or would have evaluated credibility in a different manner."]; Niewieroski v Natl. Cleaning Contractors, 126 AD2d 424, 425 [1st Dept 1987] ["Thus, this dispute as to the proof was for the jury to resolve in assessing all of the evidence as well as the credibility of the witnesses."]). This is particularly true when the case hinges on conflicting expert testimony (McDermott at 206-207; Fontana v Kurian, 214 AD2d 832, 833 [3d Dept 1995]; see Gerdik v Van Ess, 5 AD3d 726, 727 [2d Dept 2004]; Lichtenstein v Bauer, 203 AD2d 89, 89 [1st Dept 1994]). Lastly, a trial court should always appreciate the fact that it may not interfere with the jury's fact finding process merely because it disagrees with the jury's findings or would have reached a different conclusion based on the credibility of the evidence and witnesses before the jury (Cholewinski at 191; Rivera at 203).
Instead, and again, the court's role is limited to determining whether the jury verdict is palpably wrong and could not have been reached upon any fair interpretation of the evidence (Rivera at 203; Cholewinski at 191). To do otherwise and disturb a jury verdict upon the court's mere disagreement with the verdict is tantamount to "usurpation of the jury's duty" (McDermott at 206 [internal quotation marks omitted]; Pena v New York City Tr. Auth., 185 AD2d 794, 795 [1st Dept 1992]. Thus, before the court can conclude whether a particular verdict is against the weight of the evidence, it must review the evidence adduced at trial, interpret the same fairly, and determine whether a fair interpretation supports the verdict rendered by the jury. If the court finds that a fair interpretation of the evidence supports the jury verdict it should not set the verdict aside (Rivera at 203).
By its express terms, CPLR § 4404(a), authorizes the trial court to set aside a jury verdict in the interest of justice. Whether to set a side a verdict in the interest of justice is within the trial court's discretion and in deciding whether to set aside a verdict and grant a new trial in the interest of justice, the trial judge must decide whether substantial justice has been done (Micallef v Miehle Co., Div. of Miehle-Goss Dexter, Inc., 39 NY2d 376, 381 [1976]; Duran v Temple Beth Sholom, Inc., 155 AD3d 690, 693 [2d Dept 2017]; Morency v Horizon Transp. Services, Inc., 139 AD3d 1021, 1024 [2d Dept 2016]). Stated differently, in determining whether to set aside a jury's verdict on grounds that the interests of justice so mandate, the court needs to determine whether during the trial there were "errors in rulings on admissibility of evidence, mistakes in the charge, misconduct, newly discovered evidence and surprise," which prejudicially affected the verdict (In re De Lano's Estate, 34 AD2d 1031, 1032 [3d Dept 1970], affd sub nom. Matter of In re Estate of De Lano, 28 NY2d 587 [1971]; see Alonzo v City of New York, 188 AD3d 1123, 1124 [2d Dept 2020]; Duran at 693; Morency at 1023; Allen v Uh, 82 AD3d 1025, 1025 [2d Dept 2011]). As the Court noted in Micallef, in determining whether to set aside a verdict in the interests of justice
[t]he Trial Judge must decide whether substantial justice has been done, whether it is likely that the verdict has been affected and must look to his own common sense, experience and sense of fairness rather than to precedents in arriving at a decision
(id. at 381).
With respect to evidence, its improper exclusion or admission by the court at trial is only prejudicial if its admission or exclusion would have produced a different result (CPLR § 2002; Simone v McNamara, 59 AD3d 349, 349 [1st Dept 2009]; Div. Seven, Inc. v HP Builders Corp., 58 AD3d 796, 797 [2d Dept 2009]; Barracato v Camp Bauman Buses, Inc., 217 AD2d 677, 678 [2d Dept 1995]; Milone v Milone, 266 AD2d 363, 363 [2d Dept 1999]). Accordingly, if the error in admitting and/or excluding evidence is harmless, there is no prejudice and setting aside a jury verdict in the interest of justice is unwarranted (Willinger v City of New Rochelle, 212 AD2d 526, 527 [2d Dept 1995]; Grawer Bear Const. Corp. v Bellino Const. Co., Inc., 195 AD2d 499, 500 [2d Dept 1993]).
It is well settled that review of errors pertaining to the admissibility of evidence, committed by a trial court during a trial, are only assailable on a motion to set aside the verdict if preserved by an objection and/or an exception during the trial (Crane v Powell, 139 NY 379, 389 [1893]; Hecla Powder Co. v Sigua Iron Co., 157 NY 437, 441 [1899]; In re Levine's Estate, 247 AD 19, 21 [1st Dept 1936]; Bennett v Nazzaro, 144 Misc 450, 453 [Sup Ct 1932], affd sub nom. Bennett v Nazarro, 237 AD 866 [3d Dept 1932]; Gregory & Selman v Dodge & Green, 1835 WL 2655, *616 [NY 1835]). Indeed, as the court in Hecla Powder Co. aptly noted, the court
cannot reverse the judgment appealed from unless the record affirmatively shows the denial of some legal right to the appellant during the progress of the trial, and that such denial was duly excepted to. In a civil action we can only reverse upon exceptions, and are compelled to disregard all errors committed by the trial court, unless they were pointed out by an objection and saved by an exception, no matter how serious those errors may be. It is necessary for a party who wishes to preserve a point for the consideration of this court to give the trial court a chance to act advisedly by interposing a proper objection, which raises the point, and by taking an exception, which saves the point. No objection, not taken upon the trial, can be urged or considered here.
(id. at 441 [internal citations omitted]). The foregoing was more strongly stated by the trial court in Bennett, 237 AD 866 when it asserted that
[t]he failure to object to incompetent evidence has been construed as a waiver, and when, as here, the evidence admitted is competent, the failure to object is fatal, and this is so notwithstanding no objection was made because the objecting party did not know the contents of the exhibit offered
(id. at 831-832). Thus, testimony received at trial absent an objection cannot then be assailed after trial since objection to the same is deemed waived (Horton v Smith, 51 NY2d 798, 799 [1980]). To be sure, "[w]hen a timely objection is not made, the testimony offered is presumed to have been unobjectionable and any alleged error considered waived."]; Spath v Storybook Child Care, Inc., 137 AD3d 1736, 1738 [4th Dept 2016] ["Defendants failed to preserve for our review their contention that the court erred in admitting the opinions and conclusions contained in the police report because they failed to object at trial to the testimony of the investigator who authored the police report."]; Matter of State v Wilkes, 77 AD3d 1451, 1452 [4th Dept 2010] ["Second, respondent failed to preserve for our review the majority of his contentions concerning the reliance by petitioner's psychological experts upon hearsay information in forming their opinions. Respondent moved in limine to preclude petitioner's psychologists from relying upon [*4]hearsay information, inter alia, on the ground that such hearsay information was not sufficiently reliable to form the basis for an expert opinion. The court declined to rule on respondent's motion in advance of trial. At trial, respondent raised that objection only once, in response to the reliance by one psychologist upon parole documents that referenced arrest reports regarding a rape conviction, and conversations with respondent's father regarding that offense. Respondent did not contend that any other specific record or document relied upon by any of the psychologists was unreliable hearsay. Consequently, respondent preserved for our review his contention that only one of the psychologists improperly relied upon hearsay documents or records other than the parole documents and the conversations with his father in forming the psychologist's expert opinion, and his contention is thus properly before us only with respect to such documents and conversations in connection with that one psychologist" [internal quotation marks omitted]; In re Levine's Estate at 21). In In re Levine's Estate, the Appellate Division affirmed a decree issued by the Surrogate's Court, finding that the record established that respondents were entitled to an attorney's charging lien upon proceeds recovered by them on behalf of decedent and then held by petitioners (id. at 20). Significantly, petitioners sought reversal of the trial court's decree on grounds that the testimony proffered by respondents at trial was inadmissible (id. at 21). On appeal, the court affirmed holding that
this point was not raised by any of the objections taken at the hearing before the surrogate, and must, accordingly, be deemed waived; for proof of the existence of the contract of employment could undoubtedly have been established from other sources if appropriate objections to this evidence had been made. To preserve a point for the consideration by an appellate court it is necessary to interpose a proper objection, which raises the point
(id. at 21 [internal quotation marks omitted]). 
Similarly, the failure to object to the admission of evidence at trial precludes a post-trial application seeking to assail its consideration by the jury (Plantation House & Garden Products, Inc. v R-Three Inv'rs, 285 AD2d 539, 540 [2d Dept 2001] ["The appellant contends that the Supreme Court erred in refusing to charge the jury that the clause of the engineering contract purporting to exculpate the defendant Sigman—Weiss Associates, P.C., from the negligence of either the designer or contractor was inapplicable to the instant case. However, the entire contract was placed into evidence by the plaintiff without any exclusion of or objection to the subject provision. This served to effectively waive any claim of error by the party failing to object"]; Bennett at 832). In Bennett, plaintiff was involved in a motor vehicle accident, while a passenger in defendant White's vehicle as the same was driven by defendant Nazzaro (id. 451). During the trial plaintiff submitted White's application for registration to prove that White owned the vehicle in which plaintiff rode (id. at 451). Unbeknownst to White, the application also contained an indication that White had previously been involved in another motor vehicle accident (id. at 451). In denying the application to set aside the verdict on grounds that the jury should not have been allowed to see the evidence related to the prior accident, the trial court, inter alia, noted that White never objected to its admission and had thus waived the right seek post-trial relief, namely the setting aside of the jury verdict (id. at 453 [The court held that "[t]he failure to object to incompetent evidence has been construed as a waiver, and when, as here, the evidence admitted is competent the failure to object is fatal, and this is so notwithstanding no objection was made [*5]because the objecting party did not know the contents of the exhibit offered."]). White appealed the foregoing decision and it was affirmed (Bennet, 237 AD at 866). 

 Discussion
In support of its application, Japan submits no evidence and instead incorporates by reference portions of the Court's file on NYSCEF.
To the extent relevant, Japan relies on the verdict sheet, which evinces that after deliberating the jury awarded plaintiff $500,000 for past pain and suffering, $500,000 for future pain and suffering, and $1 million for future medical expenses. The future damages award was meant to compensate plaintiff for a period of 40.2 years [FN4]
. The verdict sheet also indicates that the jury found that plaintiff both sustained injuries as a result of this accident and that the accident also exacerbated injuries with which plaintiff was afflicted prior to the instant accident.
Japan also relies on portions of the trial transcript for testimony provided by plaintiff, Dr. Kaplan, Dr. Mandelbaum, and Dr. Kolb, and portions of the trial transcript memorializing two rulings made by this Court. Insofar as plaintiff submitted the foregoing transcripts and they are relevant to the disposition of both motions before the Court, the foregoing transcripts will be discussed below.
At the trial, plaintiff testified, in pertinent part, as follows. On August 4, 2017, plaintiff was working for Best at premises owned by Japan. As he was demolishing rocks on the second floor, he tripped and fell through an opening between the floor on which he stood and a scaffold located thereat. Plaintiff fell a distance of approximately 10-12 feet to the floor below. As he fell, his right arm came into contact with the scaffold. Plaintiff lost consciousness and was transported by ambulance to Bellevue Hospital. He complained of pain in his neck, back, right knee and right hand. His right hand was placed in a cast and he was discharged. Thereafter, plaintiff saw Dr. Kaplan, with whom he had treated previously. Dr. Kaplan prescribed physical therapy for plaintiff's left knee and ordered MRI studies for the same. On June 20, 2018, Dr. Kaplan performed surgery to plaintiff's left knee. Dr. Kaplan referred plaintiff to Dr. Thomas and Dr. Mandelbaum, the former with whom plaintiff had also previously treated. Dr. Thomas and Dr. Mandelbaum treated plaintiff for the pain in his neck and back by prescribing physical therapy and administering several epidural injections. When the epidural injections proved fruitless, Dr. Thomas and Dr. Mandelbaum referred plaintiff to Dr. Brisson, with whom plaintiff had previously treated and who, upon performing MRI studies of plaintiff's back, recommended lumbar surgery. In December 2019 or 2020, plaintiff underwent a surgery to his lumbar spine, requiring admission to the hospital for several days. Thereafter, because the surgery did not eliminate the pain, Dr. Brisson apprised plaintiff that the surgery had been unsuccessful and in September 2021, performed a second lumbar surgery. The second lumbar surgery did not eliminate plaintiff's pain. Dr. Kaplan also referred plaintiff to Dr. Botwinick, who, upon after prescribing physical therapy and performing MRI studies to plaintiff's right wrist, recommended surgery. Plaintiff had three surgeries to his right wrist, the first on April 1, 2018, the second on February 20, 2020, and the third in December 2020. The wrist surgeries, much like the lumbar [*6]surgeries did not markedly improve plaintiff's pain. Plaintiff testified that he still had difficulty using his wrist to bathe, button his shirts, write, and to lift heavy objects. Although plaintiff was prescribed Tramadol and Gabapentin by Dr. Thomas, he takes them as needed, sometimes taking Tramadol three times a day. In order to ensure that plaintiff was taking Tramadol as prescribed, plaintiff underwent urine testing, which at times evinced the absence of Tramadol. As of the time of the trial, experienced difficulty sleeping, climbing stairs, dressing, and using the toilet. Further, plaintiff could no longer work. In 2008, plaintiff was involved in a similar accident, when while using a grinder atop of a scaffold, he fell off the scaffold. As a result, plaintiff injured his left hand and his cervical and lumbar spine. Plaintiff was taken to Lenox Hill Hospital, where he received 25 stitches to his right hand and where he complained of pain to his neck and back. Plaintiff treated with Dr. Kaplan, who performed surgery to plaintiff's left hand and who referred plaintiff to Dr. Thomas and Dr. Brisson for plaintiff's lumbar injuries. Plaintiff was told he did not need back surgery and by 2011, had stopped treating for his injuries. In 2011, plaintiff returned to work in the construction industry because he felt well and had recovered from his injuries. Plaintiff filed a law suit for the injuries he sustained in the accident which occurred in 2008 and said suit was settled for $250,000. Beyond being told by Dr. Thomas to restrict his activities while he was recovering from the surgery to his left hand, plaintiff did not recall ever being told that as a result of the accident in 2008, he was totally disabled for purposes of construction work or that his injuries were going to worsen over time. 
At the trial, Jeffrey Kaplan (previously referred and hereinafter referred to as "Dr. Kaplan"), a board certified orthopedic surgeon, testified in pertinent part as follows. Dr. Kaplan first saw plaintiff on December 2, 2008, after plaintiff had been involved in an accident in which plaintiff fell from a scaffold. During that visit, plaintiff stated that he injured his back, neck, shoulder, left arm, and left knee. Dr. Kaplan ordered MRI studies of plaintiff's cervical and lumbar spine. Those studies occurred in February 2009 and evinced cervical and lumbar disc herniations. Dr. Kaplan referred plaintiff to Dr. Thomas, a pain management doctor, as well as Dr. Brisson. Dr. Kaplan also performed surgery to plaintiff's left arm. With respect to the injuries to plaintiff's spine, Dr. Kaplan prescribed physical therapy and in 2011, plaintiff was still experiencing significant restriction is his cervical and lumbar range of motion. MRI studies performed of the spine in 2011 noted degeneration in the lumbar and cervical spine. Plaintiff also continued to complain of pain to his neck and back. With respect to the injuries sustained in the 2008 accident, Dr. Kaplan last treated plaintiff in September 2011. However, he did see him in June 2016. The report that Dr. Kaplan prepared for that last visit notes that plaintiff's prognosis was poor, that he continued to experience pain in his spine, and that his cervical range of motion was restricted. Plaintiff's poor prognosis meant that he would never again be normal. On August 17, 2017, Dr. Kaplan saw plaintiff who reported that he had been involved in another accident. Plaintiff told Dr. Kaplan that on August 4, 2017, he fell off a scaffold, landing on an outstretched arm. On the foregoing date, plaintiff made complaints of pain in his right [FN5]
thumb and lower back. Dr. Kaplan ordered an MRI study of plaintiff's right hand. He saw plaintiff [*7]again on September 5, 2017, whereupon plaintiff complained of pain to his left knee, pain in the wrist, and the lower back. Despite the foregoing, there was no swelling in the knee or any restricted range of motion. Dr. Kaplan reviewed the MRI films of the right wrist and noted that they evinced a tear of the Triangular Fibrocartilage Complex (TFCC), an area just between the hand and wrist. Upon examination of the wrist, there was no evidence of clicking in the wrist or pain on the side of the wrist where the TFCC was located. Plaintiff also reported that he was again seeing Dr. Thomas for the pain in his lower back. Dr. Kaplan prescribed therapy for plaintiff's left knee, ordered an MRI study of the left knee, and recommended that plaintiff continue to treat with Dr. Thomas. On April 19, 2018, plaintiff underwent an MRI study to his left knee, which evinced a torn meniscus. Subsequently, plaintiff also underwent an EMG study with Dr. Grimm, which evinced left S1 ridiculopathy. Because therapy did not help plaintiff's knee, on June 22, 2018, Dr. Kaplan performed surgery to the left knee. Dr. Kaplan prescribed therapy for the knee and because plaintiff also continued to complaint of pain to his right wrist and because of the TFCC tear, referred plaintiff to Dr. Botwinick, a hand specialist. When Dr. Kaplan saw plaintiff on January 3, 2019, plaintiff indicated that he was seeing Dr. Brisson for his back and Dr. Botwinick for his wrist. Plaintiff also complained of pain and stiffness in his left knee. Over the next several visits, Dr. Kaplan noted crepitus and patellar grinding in plaintiff's knee as well as limited range of motion. Accordingly, Dr. Kaplan administered a steroid injection to plaintiff's knee. On these same visits, plaintiff also complained of lower back pain and upon examination Dr. Kaplan noted that plaintiff's lumbar range of motion was less than normal. Over the next few visits plaintiff noted that Dr. Brisson had performed lumbar surgery in December 2019 and an examination of plaintiff's neck indicated a positive Spurling maneuver. During a visit on July 24, 2020, plaintiff noted that he continued to experience lower back pain radiating into the left leg as well as knee pain. Upon examining plaintiff, Dr. Kaplan noted neck and back tenderness and limited range of motion in the left knee. During a visit on October 18, 2021, Dr. Kaplan noted that plaintiff reported he had a second lumbar surgery by Dr. Brisson, that he had been cleared to continue therapy and that he had noted some slight improvement in his back. Plaintiff continued to complain of knee pain, which indicates that he had developed permanent posttraumatic arthritis. Dr. Kaplan last saw plaintiff on March 9, 2023. Upon performing an examination on plaintiff he noted that he had limited range of motion in his right wrist as well as crepitus, limited range of motion in the left knee as well as patellofemoral grinding, and limited range of motion in the neck and lower back as well as tenderness. Dr. Kaplan opined that the injury to the left knee was caused by the accident on August 4, 2017 and was permanent. Dr Kaplan also opined that the injuries to plaintiff's lumbar and cervical spine were exacerbated by the accident on August 4, 2017. 
At the trial, Chiam Mandelbaum (previously referred and hereinafter referred to as "Dr. Mandelbaum"), a board certified orthopedic pain management doctor, testified in pertinent part as follows. Dr. Mandelbaum first saw plaintiff on August 16, 2011 as a result of an accident in which plaintiff was involved. Plaintiff stated that on October 10, 2008 he fell off a scaffold and injured his neck, back, and left arm. Subsequent to that accident, plaintiff initially treated with Dr. Thomas who worked with Dr. Mandelbaum, who subsequently passed away. Dr. Thomas first saw plaintiff on April 9, 2009. Plaintiff complained of pain in his cervical spine and spasm was noted at C3 through C7. Plaintiff also complained of pain in his lumbar spine and spasm [*8]was noted at L3 through S1. With respect to the foregoing accident, Dr. Mandelbaum last treated plaintiff in December 2011. Dr. Mandelbaum's report for that date of treatment states that plaintiff was afflicted with cervical and lumbar intervetebral disc degeneration, with cervical ridiculopathy. As a result of the accident in 2008, Dr. Thomas created a life care plan, wherein given plaintiff's cervical and lumbar injuries, he opined that plaintiff would need, inter alia, medications and medical treatment for his spine for the rest of his life. Moreover, Dr. Thomas concluded that as a result of the accident in 2008, plaintiff was partially disabled overall and permanently disabled from his previous occupation, namely construction. Dr. Thomas also limited plaintiff's activities, proscribing heavy lifting and repetitive flexion of the spine. Dr. Mandelbaum testified that with respect to the prior accident in 2008, plaintiff did not have ridicular pain radiating into his legs. On August 23, 2017, Dr. Mandelbaum saw plaintiff, who reported having another accident wherein he fell off a scaffold, injuring his neck, back, and right hand. Plaintiff complained of pain in his neck, back, and right hand. Plaintiff also indicated that he was treating with Dr. Kaplan. Dr. Mandelbaum performed a physical examination, noting cervical and lumbar spasm with range of motion restricted thereat. Dr. Mandelbaum prescribed medication and ordered MRI studies. Upon a review of the MRI studies performed upon plaintiff's spine on October 16, 2017, Dr. Mandelbaum noted disc cervical herniations, which had worsened when compared to the MRI films he reviewed for injuries sustained in the 2008 accident. The same was true for the lumbar MRI studies, which evinced a significant change in the lumbar herniations depicted therein. On December 11, 2017, plaintiff underwent a lumbar epidural injection and in January 2018, he underwent a radio frequency ablation procedure, both in an effort to diminish plaintiff's lumbar pain. Plaintiff also underwent trigger point injections to the cervical and lumbar spine, also in an effort to diminish his pain. On March 5, 2018, Dr. Mandelbaum saw plaintiff, who after having some injections, reported that the relief they provided were temporary and the pain to left side of his back had returned. In September 2018, plaintiff saw Dr. Thomas and his condition had remained unchanged, namely he had neck and back pain. Plaintiff reported that he was seeing Dr. Brisson, who recommended lumbar surgery and which had been approved. At that time plaintiff was still taking Tramadol, Gabapentin, and Diclofenac. In connection with the Tramadol prescribed to plaintiff, Dr. Mandelbaum was required to test plaintiff's urine to ensure he was taking the medication. Several of the urine tests in 2018 evinced that plaintiff was not taking Tramadol. During a visit on February 7, 2019, plaintiff continued to complain of lower back pain radiating into his legs, neck pain, and knee pain. On September 13, 2019, plaintiff underwent a lumbar fusion and he continued to see Dr. Mandelbaum through 2020. When Mandelbaum examined plaintiff on August 25, 2020, he was eight months post fusion, had undergone surgery to his right wrist and was still afflicted with lower back pain radiating into his legs. Plaintiff also complained of neck pain and Dr. Brisson had recommended cervical surgery. In February 2021, plaintiff was again seen by Dr. Mandelbaum and complained of constant cervical pain with spasm. On September 16, 2021, because the lumbar spine had not fused after the first surgery, plaintiff underwent a revision surgery to his lumbar spine. Dr. Mandelbaum saw plaintiff in September 2022 and upon an examination noted that plaintiff complained of knee pain, that there were spasms in the cervical and lumbar spine and that the range of motion in the spine was restricted. Dr. Mandelbaum saw plaintiff for the last time on January 8, 2024. Plaintiff's complaints were the same as before, pain [*9]in the neck and back, which radiated into his extremities, spasm, tingling, and numbness. Plaintiff also complained of pain to his left knee and right wrist. Based on the foregoing, Dr. Mandelbaum opined that plaintiff's cervical and lumbar injuries were exacerbated by the accident in 2017, that plaintiff's prognosis was poor and that he would likely need future neck surgery. Dr. Mandelbaum also opined that plaintiff would need medication and medical treatment for the rest of his life, including physical therapy, visits with an orthopedist, and the implantation of a spinal stimulator. Mandelbaum told the jury the sums associated with each item of future medical treatment as well as the frequency of the same. 
At the trial, Thomas Kolb (previously referred and hereinafter referred to as "Dr. Kolb"), a board certified radiologist, testified in pertinent part, as follows. Dr. Kolb reviewed x-ray films, MRI films, and CT scan films of several of plaintiff's body parts. With respect to plaintiff's left knee, the MRI films Dr. Kolb reviewed, which were taken on April 19, 2018, evinced that plaintiff sustained a partial tear of the posterior horn of the medial meniscus. With respect to plaintiff's cervical spine, MRI films for studies performed on February 13, 2009, evinced small posterior disc herniations at C3-C4 and C5-C6. MRI films for studies performed in 2017 evinced larger disc herniations at C3-C4 and C5-C6 and a new posterior disc bulge C4-C5. With respect to the lumbar spine, MRI films for studies performed in 2009 evinced a disc herniation at L4-L5 and L5-S1. MRI films for studies performed in 2017 evince that the disc herniation at L5-S1 became larger. With regard to the right wrist, MRI films for studies performed on April 19, 2018 evince a TFCC tear. Dr. Kolb testified that none of the films of the spine showed degeneration of any of the discs.
At the trial, Paul Brisson (previously referred and hereinafter referred to as "Dr. Brisson"), a board certified orthopedic surgeon, testified in pertinent part as follows. He first treated plaintiff on February 1, 2010, after plaintiff was involved in an accident where he fell of a scaffold. Plaintiff complained of neck and back pain. Dr. Brisson reviewed MRI studies performed on plaintiff's cervical and lumbar spine on February 13, 2009. The studies evinced disc herniations at C3-C4, C5-C6, L4-L5, and L5-S1. Dr. Brisson prescribed physical therapy and pain management and did not see plaintiff again until March 28, 2018. During this visit plaintiff reported being involved in another accident wherein he again fell off a scaffold. Upon performing an examination, Dr. Brisson noted pain on palpation at plaintiff's lumbar spine. Dr. Brisson reviewed MRI films for studies performed on October 16, 2017 and noted that they evinced the disc herniations at C3-C4, C5-C6, L4-L5, and L5-S1. However, the herniation at L5-S1 had grown larger since the MRI studies performed in 2009. Dr. Brisson prescribed epidural injections and an EMG test. Dr. Brisson ordered another MRI study to plaintiff's lumbar spine, which was performed on March 5, 2019. The study showed that the herniation at L5-S1 had grown bigger. Because plaintiff's pain in his lower back had been consistent, Dr. Brisson recommended surgery - a lumbar fusion. On December 13, 2019, Dr. Brisson performed an anterior diskectomy fusion, performed through plaintiff's abdomen. Subsequently, because plaintiff's complaints of neck pain were persistent, a review of an MRI study performed to plaintiff's cervical spine on March 3, 2020 evinced that the disc herniation at C5-C6 had grown larger. As a result, Dr. Brisson recommended cervical surgery - a cervical fusion. Because the surgery to plaintiff's lumbar spine had not made him significantly better, Dr. Brisson ordered a CT scan of the lumbar spine, which was performed on March 24, 2011. Said scan evinced that [*10]the lumbar fusion failed and therefore, Dr. Brisson recommended a revision surgery. On September 16, 2021, Dr. Brisson performed a revision surgery, this time through plaintiff's back. Dr. Brisson last saw plaintiff on May 5, 2023, and examined him on March 21, 2022. That examination evinced that plaintiff's complaints were mostly about his neck. Dr. Brisson again recommended surgery, but plaintiff declined. Dr. Brisson opined that the accident in 2017 exacerbated plaintiff's spine injuries and that the injuries are permanent.
At the trial, Nelson Botwinick (previously referred and hereinafter referred to as "Dr. Botwinick"), a board certified orthopedic surgeon, testified in pertinent part as follows. On November 2, 2018, Dr. Botwinick saw plaintiff for an injury to his right hand. Plaintiff stated that on August 4, 2017, he had fallen of a scaffold and injured his knee, back and right wrist. Upon a review of an MRI study performed on plaintiff's right wrist on August 21, 2017, Dr. Botwinick diagnosed plaintiff with a TFCC tear that required surgical correction. On April 30, 2019, Dr. Botwinick performed surgery on plaintiff's right wrist to repair the TFCC tear. Plaintiff was placed in a cast until May 29, 2019. X-rays taken that day revealed that TFCC tear had been successfully repaired. Upon examining plaintiff on June 28, 2019, Dr. Botwinick found that plaintiff's wrist range of motion was improving. The same was true when Dr. Botwinick examined plaintiff on July 26, 2019. However, on that date, plaintiff had developed issues in his right thumb, when the same would lock, get stuck, and click. Dr. Botwinick diagnosed plaintiff with tendinitis. Because plaintiff continued to experience the foregoing issues with his thumb, on August 16, 2019, Dr. Botwinick put plaintiff in a splint and recommended surgery to repair the thumb. On February 25, 2020, Dr. Botwinick performed surgery on plaintiff's thumb and installed anchors and a suture to rebuild the ligament at the base of the thumb. On September 2, 2020, plaintiff's thumb once again began to lock. As a result, Dr. Botwinick recommended another surgery to repair the same - a trigger finger release known as a tenosynovectomy. The foregoing surgery was performed on December 10, 2020. Plaintiff was seen for the last time on February 17, 2021, by which time his thumb was not bothering him and he had regained more range of motion in the wrist. Dr. Botwinick opined that the wrist and thumb injuries plaintiff sustained were caused by the accident in 2017 and were permanent.
At the trial, Fred Goldman (Goldman), an economist, testified, in pertinent, part as follows. He was retained to prepare an estimate of the cost of plaintiff's future medical treatment. Goldman prepared his estimate using Dr. Mandelbaum's treatment plan and applying the relevant growth rate to the amounts listed therein. Goldman estimated that plaintiff had a life expectancy of 38.1 years. Because Dr. Mandelbaum recommended medications for the rest of plaintiff's life at a cost of $21,780, Goldman applied a growth rate of 3.1 percent and estimated that over the course of plaintiff's life the cost of medications would be $1,545,799. Because Dr. Mandelbaum recommended visits to a pain management doctor for the rest of plaintiff's life at a cost of $2,400 per year, Goldman applied a growth rate of 2.5 percent and estimated that over the course of plaintiff's life the cost of said visits would be $149,959. Goldman performed the foregoing analysis for everything in Dr. Mandelbaum's treatment plan estimating that visits to see an orthopedist would cost $24,993, transforminal injections to the lumbar spine would cost $129,368, transforminal injections to the cervical spine would cost $62,483, lubrication injections to the left knee would cost $74,979, injections to the wrist would cost $12,497, trigger point injections would cost $74,799, physical therapy would cost $83,181, and installation of a [*11]spinal cord stimulator with necessary battery changes would cost $204,508. Goldman opined that the total cost of plaintiff's future medical care was $2,682,411.
Pursuant to the trial transcript, all x-rays, MRI films and CT scans were admitted into evidence by stipulation. Specifically, on January 18, 2024, all the foregoing films and reproductions (blowups) of the same were marked into evidence as plaintiff's Exhibits 8-32. To that end, the following exchanged occurred,
THE COURT: and then this morning, my understanding is that there had been items 8 through 32, Plaintiff's 8 through 32, which are comprised of CD's and films, those are now in evidence by stipulation. Is that true?
MR. VARGAS: Correct, and there are films. There are CD's and the blow ups of those films from the CD's.
THE COURT: And that's by stipulation? Yes?
MR. ITZKOWITZ: Yes, Your Honor.
Moreover, because Dr. Kolb testified solely with respect to a review of diagnostic films, the Court ruled that he could not offer any opinions regarding causation between the accident alleged and the injuries depicted within any of the films in evidence. Lastly, with respect to all the MRI films in evidence, during their deliberations, on February 2, 2024, the jury sent a note to the Court, which was marked as Court Exhibit V. The note stated, "[m]ay we see the poster boards for 2008-2017 on the cervical spine and the lumbar spine?" After consultation with counsel for Japan and for plaintiff, the Court noted that the jury wanted to see all the diagnostic films in evidence. However, because the films for the cervical spine were on a computer, which was not present in court that day, by agreement, and because Japan wanted the jury to see all the films in evidence, the Court told the jury that they would get to see all the films after the weekend. Per the record, the following discussion ensued. 

THE COURT: It would appear to me that they're denominating the film, not based on the date of the film, but on the date of the accident that gave rise to each set of films. That's the first order of business. They're having a discussion off the record and my understanding is that while we have some of the 2008 films, we don't have the cervical, the MRI films that were taken subsequent to the 2008 accident of the cervical spine because those are on a computer. I also understand that we do have blow ups of the post-2008 lumbar MRI studies and, of course, we have blow ups of all of the MRI studies that Were taken subsequent to the 2017 accident. Defense counsel has a concern that he wants to show them. He wants to be able to show them all the films that they have asked for. So, theoretically, the only way to do that is to have plaintiff's technology person, who is not here today, come back and he has these films about which an expert testified, the discs of which are in evidence on his computer, and he can come back on Monday, and we can take care of that. So, for today, I will have to tell the jury, and you'll tell me if you have an issue, that in order to give them the evidence that they seek, we have to wait until Monday, and that they should either send the note out saying that they still want that and wait until Monday or indicate to me in a note that they no longer need that and they're going to proceed without it. Is that acceptable to everybody?
MR. VARGAS: Yes, Your Honor.
MR. ITZKOWITZ: Yes, Your Honor
(emphasis added). Thereafter, the jury was shown all of the films that were in evidence, but prior thereto, the following discussion occurred.
THE COURT: Good morning. We are reconvening again this morning to resume jury deliberations in this case. We have Plaintiff's technician in the courthouse and he's ready, willing and able to show the jurors the post-2008 accident, cervical lumbar MRI's, which the jury requested in its most recent note. And then we have hard copies that had been available of the post-2017 lumbar and cervical, post-2017 accident, lumbar and cervical MRI's, which we're going to show the jury. By agreement, what we're going to do is that we're going to bring the jury out. I'm going to indicate to them that they're first going to see digitally the post-2008 cervical and lumbar MRI films, and that they're going to be scrolled through a computer on the screen, and that at some point, I'll indicate to them do you need to see this image any further. If they all kind of collectively say no, we'll go on to the next one, and we'll do that until we get through all the digital versions of the MRI films. Thereafter, we're going to show them the post-2017 lumbar and cervical MRI films, which are, again, a hard copy. We're going to put them on an easel, and the same thing. I'm going to say, if you need to see this anymore? We can scroll through it. And we're going to do it until we're done reviewing everything. And then I'm going to instruct them that should they want to have the post-2017 accident MRI films in the jury room for the deliberation, they can send the note out to that effect and we'll — they're a lot of them — but we'll endeavor to bring them all out to them. Okay?
MR. ITZKOWITZ: Yes.
Based on the foregoing, Japan's application to set aside the verdict in the interests of justice is denied. Significantly, here the purported error on which Japan premises the relief sought was waived. Moreover, the record reveals that the very evidence upon which Japan premises its motion was discussed at length by Dr. Kolb as well as other medical experts at the trial.
As noted above, CPLR § 4404(a), authorizes the trial court to set aside a jury verdict in the interest of justice. Whether to set a side a verdict in the interest of justice is within the trial court's discretion and in deciding whether to set aside a verdict and grant a new trial in the interest of justice, the trial judge must decide whether substantial justice has been done (Micallef at 381; Duran at 693; Morency at 1024). Stated differently, in determining whether to set aside a jury's verdict on grounds that the interests of justice so mandate, the court needs to determine whether during the trial there were "errors in rulings on admissibility of evidence, mistakes in the charge, misconduct, newly discovered evidence and surprise," which prejudicially affected the verdict (In re De Lano's Estate at 1032; see Alonzo at 1124; Duran at 693; Morency at 1023; Allen at 1025).
With respect to evidence, its improper exclusion or admission by the court at trial is only prejudicial if its admission or exclusion would have produced a different result (CPLR § 2002; Simone at 349; Div. Seven, Inc. at 797; Barracato at 678; Milone at 363). Accordingly, if the error in admitting and/or excluding evidence is harmless, there is no prejudice and setting aside a the jury verdict in the interest if justice is unwarranted (Willinger at 527; Grawer Bear Const. [*12]Corp. at 500).
Notwithstanding the foregoing, it is equally well settled that review of errors pertaining the admissibility of evidence, committed by a trial court during a trial, are only assailable on a motion to set aside the verdict if preserved by an objection/ and or an exception during the trial (Crane 389 [1893]; Hecla Powder Co. at 441; In re Levine's Estate at 21; Bennett at 453; Gregory & Selman v Dodge & Green, 1835 WL 2655, *615). Similarly, the failure to object to the admission of evidence at trial precludes a post-trial application seeking to assail its consideration by the jury (Plantation House & Garden Products, Inc. at 540; Bennett at 832).
Here, Japan's motion must be denied because based on the record, when the jury sought to view all of the MRI films in question and the Court proposed to show the jury the same, it was clear that the jury would be shown the films absent any accompanying testimony. Despite the foregoing, rather than object to such a course of action, Japan, by its counsel Mr. Itzkowitz, acquiesced. For this reason, even if showing the jury the films without also, as urged, accompanying testimony explaining to the them what they were viewing, was an error, the same was waived by Japan's failure to object and raise the issue at the time. 
Notwithstanding the foregoing, were the Court to reach the merits of the instant application, it would conclude that the same is meritless.
First, it is beyond cavil that a trial jury is entitled to see all documents admitted by the court into evidence (Atkins v Metronome Events, Inc., 187 AD3d 429, 429 [1st Dept 2020]; Stanton v City of New York, 74 AD2d 623, 623-624 [2d Dept 1980] ["The trial court properly refused to admit the report into evidence. However, it is undisputed that this report was thereafter submitted to the jury as an exhibit at some point prior to or during its deliberations. The submission of the report to the jury substantially prejudiced the plaintiff and therefore a new trial is required."] Guntzer v Healy, 176 AD 543, 544 [1st Dept 1917] ["The rule is well settled that the delivery of papers to the jury not in evidence or which contain excluded matter when or after it retires for deliberation without the consent of the court avoids the verdict unless the matters contained therein are not prejudicial or if it appears that they were not read by any of the jury."]). Here, the films at issue were in evidence and the jury was entitled to see them. Any contention to the contrary is absurd, as is any contention that the Court was required to read explanatory testimony to the jury it never requested. To the extent that Japan relies on J.T.M. v Parrinello, (2020 NY Misc LEXIS 21648), persuasive and not binding authority, where the trial court denied the jury's request during deliberations, after a trial, to view MRI films evidence (id. at *5), for the reasons that follow hereinafter, this Court disagrees with the holding therein and need not follow it. Morever, Japan's reliance on Campopiano v Volcko (61 AD3d 1343 [4th Dept 2009]), where on appeal, the court set aside the jury verdict in favor of plaintiff because there was a question with respect to "whether the juror improperly undertook the role of an expert juror who provided personal specialized assessments not within the common ken of juror experience and knowledge concerning a material issue in the case" (id. at 1344 [internal quotation marks omitted]) is absurd. The facts alleged here and in Campopiano could not be more inapposite.
Second, paradoxically, Japan's argument fails to appreciate that although the jury viewed the films absent any accompanying testimony, there had been ample testimony during the trial about the films and what was depicted therein. Indeed, Dr. Kolb as well as Dr. Brisson, both medical experts, the former a radiologist, discussed the films at length and what they depicted. [*13]Thus, contrary to Japan's assertion the juror's review of the films was not "tantamount to risking having a juror (or jurors) provide an assessment outside the normal 'ken'" (NY St. Cts elec Filing [NYSCEF] Doc No. 407 at 6 [Memorandum of Law]). Indeed, this Court unlike the Court in J.T.M., holds that it is not necessary to precondition a jury's ability to see films in evidence unless explanatory testimony is also read to them, where as here, there was ample testimony regarding the contents of the films during trial.
Accordingly, even if the jury should not have been shown the films, as urged, without, at the very least a reading of the testimony interpreting the same, because the jury had already heard ample expert testimony regarding the films, any such error is harmless and therefore not prejudicial so as to warrant setting aside the verdict in the interests of justice. Again, a verdict ought to be set aside in the interests of justice upon "errors in rulings on admissibility of evidence, mistakes in the charge, misconduct, newly discovered evidence and surprise," which prejudicially affected the verdict (In re De Lano's Estate at 1032; see Alonzo at 1124; Duran at 693; Morency at 1023; Allen at 1025). Here, of course, it cannot be said that any purported error was prejudicial to Japan.
To the extent that Japan seeks to set aside the jury's verdict with respect to future medical treatment, the application is denied. 
Preliminarily, Japan's papers are bereft of any argument with respect to this portion of its application or any factual underpinning for the same. Indeed, the only mention of the instant relief is within the portion of Japan's application seeking relief pursuant to CPLR § 5501(c). This of course, is in error, since the instant application is one pursuant to CPLR § 4401(a). 
Again whether a verdict is against the weight of the evidence requires a determination of whether questions of fact were correctly resolved by the trier of fact (Cohen at 498). Indeed, the court "does not have the power to make new findings of fact in a jury case" (id. at 498), and if the verdict is against the weight of the evidence, the remedy is a new trial (id. at 498). Significantly, a jury verdict shall not be set aside and shall stand unless and until the court concludes that the jury could not have reached the verdict on any fair interpretation of the evidence proffered at trial (Delgado at 644).
Here, the salient inquiry is whether the jury's verdict with respect to future medical treatment is supported by competent evidence such that it is premised on a fair interpretation thereof.
To that end, it is well settled that expert testimony must be based on facts in the record or personally known to the witness, and that an expert cannot reach a conclusion by assuming material facts not supported by record evidence (Cassano v Hagstrom, 5 NY2d 643, 646 [1959]; Gomez v New York City Hous. Auth., 217 AD2d 110, 117 [1995]; Matter of Aetna Cas. & Sur. Co. v Barile, 86 AD2d 362, 364-365 [1982]). Moreover, the proponent of future medical records is required to establish the cost of such treatment and its necessity by a fair preponderance of the evidence (Kavanaugh v Nussbaum, 129 AD2d 559, 563 [2d Dept 1987]["We conclude, however, that the trial court properly set aside the award of $600,000 for future institutional custodial care. Although the plaintiffs proffered testimony regarding the cost of such care, they simply failed to establish, by a preponderance of the credible evidence, the necessity of such care for the infant plaintiff."], affd as mod sub nom., Kavanaugh by Gonzales v Nussbaum, 71 NY2d 535 [1988]; see Pouso v City of New York, 22 AD3d 395, 397 [1st Dept 2005] ["However, the award of [*14]$60,000 for future medical expenses was properly set aside as speculative and unproven with reasonable certainty."]; Hernandez v New York City Tr. Auth., 52 AD3d 367, 369 [1st Dept 2008] ["The award of $3,042,949 for a home health aide for the next 24 years was speculative and unproven with reasonable certainty."]; Firmes v Chase Manhattan Automotive Fin. Corp., 50 AD3d 18, 29 [2d Dept 2008]; Reed v Harter Chair Corp., 185 AD2d 547, 549 [3d Dept 1992]).
Here, the evidence at trial with respect to future medical treatment was that proffered by Dr. Mandelbaum who opined reagarding the need for such treatment and the present cost of the same. Additionally, Goldman, an economist, opined that using the costs prescribed by Dr. Mandelbaum, he, using the applicable growth rates, estimated that the total cost for plaintiff's future medical treatment is $2,682, 411. 
Based on the foregoing, the jury award for future medical treatment in the sum of $1 million is based on the testimony of two experts, both of whom testified based on the evidence on trial and their respective fields. To that end, the jury was entitled to credit plaintiff's experts and disregard any controverting evidence by Japan's experts (Burgos v Lovell Realty, Inc., 229 AD2d 558, 559 [2d Dept 1996] ["Specifically, the jury was entitled to accept the opinion of the defendant's experts and to reject the testimony of the plaintiff's experts."]; see Benloss v Roal Drug Corp., 215 AD2d 423, 423 [2d Dept 1995]; Connolly v Pastore, 203 AD2d 412, 413 [2d Dept 1994]). Accordingly, the foregoing award is not against the weight of the evidence. Nor does it avail Japan that its experts [FN6]
rendered controverting opinions about the need for any future medical treatment since again, the inquiry is whether any version of the evidence at trial supports the jury's verdict, which as noted above, is the case here. 
Japan's motion to set aside the verdict is denied.

JAPAN'S MOTION FOR REMITTITUR AND PLAINTIFF'S MOTION FOR ADDITUR
Plaintiff's motion seeking additur to jury's verdict for pain and suffering damages is granted. Significantly, the record evinces that the jury's award for pain and suffering damages materially deviates from what would have been reasonable compensation for the injuries he sustained. Japan's motion seeking remittitur is denied. Significantly, the record evinces that the jury's verdict for pain and suffering damages was less than what would have been reasonable compensation for the injuries plaintiff sustained.

Standard of Review
CPLR § 5501(c) sets the standard of review in assessing the adequacy of a jury award and states that
[i]n reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is [*15]excessive or inadequate if it deviates materially from what would be reasonable compensation.
Thus, pursuant to CPLR § 5501(c), if the court concludes that an award of damages is excessive or inadequate, meaning when the award materially deviates from what would have been reasonable compensation, the court must set aside the jury verdict, prescribed an amount of damages, and unless the parties stipulate to a different award, order a new trial on damages (Bonanno v Port Auth. of New York and New Jersey, 14 AD3d 377, 377-378 [1st Dept 2005]; Nevarez v New York City Health and Hosps. Corp., 248 AD2d 307, 308-310 [1st Dept 1998]; Bernstein v Red Apple Supermarkets, 227 AD2d 264, 266 [1st Dept 1996]; Neils v Putnam Hosp. Ctr., 276 AD2d 607, 607-608 [2d Dept 2000]; Forslund v Nunez, 250 AD2d 645, 645-646 [2d Dept 1998]
While the standard of review, by its very statutory terms, applies only to an appellate review of damages by the Appellate Division, it has nevertheless been held that the trial court is free to apply this standard when deciding post trial motions seeking to set aside the damages portion of a jury verdict and an adjustment of the same (So v Wing Tat Realty, Inc., 259 AD2d 373, 374 [1st Dept 1999] ["Although possessing the power to set aside an excessive jury verdict, a trial court should nonetheless be wary of substituting its judgment for that of a panel of fact finders whose peculiar function is the fixation of damages. Modification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible."]; Shurgan v Tedesco, 179 AD2d 805, 806 [2d Dept 1992]["However, under the circumstances of this case, we find that the trial court properly set aside the jury's award of damages as inadequate since the award materially deviated from what would be reasonable compensation."]; Inya v Ide Hyundai, Inc., 209 AD2d 1015,1015 [4th Dept 1994] ["Supreme Court may set aside a jury's award of damages if it materially deviates from what would be reasonable compensation."]; Prunty v YMCA of Lockport, 206 AD2d 911, 912 [4th Dept 1994]; Cochetti v Gralow, 192 AD2d 974, 975 [3d 1993]; Wendell v Supermarkets General Corporation, 189 AD2d 1063, 1064 [3d Dept 1993]).
Understandably, the method of review, to the extent that it seeks to assign amounts and monetary value to subjective non-economic injuries, cannot produce mathematically precise results (Donlon v City of New York, 284 AD2d 13,15 [1st Dept 2001]). Indeed, the analysis undertaken by the court is one of mixed questions of law and fact, requiring the court "to determine what awards have been previously approved on appellate review and whether the instant award falls between those boundaries" (id. at 16-18). To that end, the task of valuating a particular injury to determine its reasonable value involves the identification of factual similarities between the case under review and other previously decided cases as well as the application of reasoned judgment (id. at 15). Hence, the court is not expected to reach its decision by comparing the case under review with its precise factual counterpart (id. at 16). Instead, the court is free to use other cases with similar but not necessarily identical injuries, since said cases merely serve as a guide or point of reference (Senko v Fonda, 53 AD2d 638, 639 (2d Dept 1976 ["A long course of practice, numerous verdicts rendered year after year, orders made by trial justices approving or disapproving them, decisions on the subject by appellate courts, furnish to the judicial mind some indication of the consensus of opinion of jurors and [*16]courts as to the proper relation between the character of the injury and the amount of compensation awarded."]). Stated differently,"[c]ase comparison cannot be expected to depend upon factual identity. More often, analogous cases will be useful benchmarks (Donlon at 16). Indeed,
[l]ong observation of the action of juries in cases of [similar] personal injury affords a clue to the judgment of ordinary men as to the compensation that should be made for pain and suffering; and where a verdict is much above or much below the average, it is fair to infer, unless the case presents extraordinary features, that passion, partially, prejudice, or some other improper motive has led the jury astray
(Senko at 639). Since the other cases used by the court in determining whether the verdict at issue constitutes a material deviation and what amount represents reasonable compensation are merely useful benchmarks or reference points, it stands to reason, that the absence of a factually identical case does not preclude a finding that the verdict at issue was both a material deviation and not reasonable compensation for the injury alleged.
While it is true that generally the determination of damages and their proper value is primarily a question of fact best left to a jury, the court nevertheless has a duty to set aside a damages verdict when such verdict is excessive (id. at 639). In fact, when a jury verdict is contrary to the weight of the evidence, or where it is excessive or inadequate, the trial court is vested with the power, and has the duty, to set it aside and order a new trial (id. at 639; Kligman v City of New York, 281 AD 93, 94 [1st Dept 1952] ["Where the verdict of a jury is contrary to the weight of the evidence, or where it is excessive or inadequate, the trial court is vested with the power and has the duty to set it aside and to order a new trial."])).
Assuming that a verdict must be set aside, the judge who presided over the trial is in a better position than an appellate court to assess whether the verdict reached is in anyway excessive (Kligman at 94). This is because "[a] judge who presides at the trial has supervisory power over a jury's verdict. He is in the atmosphere of the trial; he sees the witnesses, hears their testimony, and in a personal injury action such as this he observes the nature and extent of the injuries claimed" (id. 94). For these reasons, should the trial court decide to alter the verdict through the use of its discretion, absent an abuse of such discretion, an appellate court, will rarely interfere (Hogan v Franken, 221 AD. 164, 165 [3d Dept 1927]).

Discussion
Here, a review of the record establishes that in 2008, prior to the instant accident, plaintiff was involved in a similar accident and sustained injuries to his cervical and lumbar spine and his left arm. Thereafter, by 2011 or 2012, he had returned to work because he had recovered from his injuries. In 2017, he was involved in the instant accident and injured his left knee and right wrist and also re-injured his cervical and lumbar spine. As a result, plaintiff underwent surgery to repair a torn meniscus to his left knee, a lumbar diskectomy and fusion at L4-S1, a revision to the same portion of the spine, and three surgeries to his right wrist/thumb. Moreover, the record establishes that although plaintiff had pre-existing herniations at C3-C4 and C5-C6, the instant accident caused them to increase in size, that plaintiff was afflicted with significant pain as a result, that surgery was recommended, but that it was never performed. Plaintiff underwent conservative treatment, including physical therapy, a radio frequency ablation to his spine and epidural and trigger point injections thereto.
The foregoing was established by both plaintiff's testimony and that of his expert/treating doctors, many of whom opined that the injuries sustained by plaintiff were permanent, would limit plaintiff's ability to perform tasks in the future and would require life-long medical treatment. Almost all of plaintiff's doctors opined that the spine injuries were exacerbated by the 2017 accident.
Accordingly, the relevant inquiry with respect to additur and remittitur is whether the jury's award of $500,000 for past pain and suffering and $500,000 for future pain and suffering, the latter to cover a period of 40.2 years, materially deviates from what would constitute adequate compensation for the foregoing injuries. The Court finds that the foregoing award was insufficient and grants plaintiff's motion. 
As noted above pursuant to CPLR § 5501(c), if the court concludes that an award of damages is excessive or inadequate, meaning when the award materially deviates from what would have been reasonable compensation, the court must set aside the jury verdict, prescribed an amount of damages, and unless the parties stipulate to a different award, order a new trial on damages (Bonanno at 377-378; Nevarez at 308-310; Bernstein at 266; Neils at 607-608; Forslund at 645-646). In order to determine the adequacy of a verdict, court should "determine what awards have been previously approved on appellate review and whether the instant award falls between those boundaries" (Donlon at 16-18). To that end, the court should identify factual similarities between the case under review and other previously decided cases and should apply its reasoned judgment (id. at 15). Indeed, the court is not expected to reach its decision by comparing the case under review with its precise factual counterpart (id. at 16). Instead, the court is free to use other cases with similar but not necessarily identical injuries, since said cases merely serve as a guide or point of reference (Senko at 639). Stated differently,"[c]ase comparison cannot be expected to depend upon factual identity. More often, analogous cases will be useful benchmarks (Donlon at 16).
Here, with respect to plaintiff's lumbar spine injury, namely a preexisting herniation at L5-S1, which upon exacerbation required two surgeries, one of which was a fusion surgery, the Court finds that $500,000 for past pain and suffering and $500,000 million for future pain and suffering constitutes adequate compensation for his injuries (Xie v Park Place Estate, LLC, 181 AD3d 627, 628-29 [2d Dept 2020] [In an action where plaintiff sustained ""a spinal fracture requiring fusion surgery, as well as a head injury involving intracranial hemorrhage," the court found that $400,000 for past pain and suffering and $250 for future pain and suffering was adequate compensation.]; Robles v Polytemp, Inc., 127 AD3d 1052, 1055 [2d Dept 2015] ["in an action where plaintiff "sustained herniations requiring two spinal fusion surgeries as a result of the accident and where epidural injections and physical therapy were unsuccessful," the court held that $400,000 for past pain and suffering and $400,000 for future pain and suffering did not deviate from reasonable compensation."]; Williams v City of New York, 105 AD3d 667, 668 [1st Dept 2013] [In an action where "plaintiff underwent a discectomy and then a fusion surgery that ultimately resulted in removal of the L4/L5 disc. He also underwent a painful discogram, a painful IDET procedure, and multiple epidural injections," court held that $1.2 million for past pain and suffering and $1.2 million for future pain and suffering over a period of 15 years was adequate compensation.]; Gonzalez v Rosenberg, 247 AD2d 337, 337 [1st Dept 1998] [In an action where plaintiff suffered a "herniated disk at L4-L5 was the subject of two unsuccessful [*17]laminectomies and a myelogram, and a recommendation for a third surgery, and caused plaintiff considerable pain and debilitation," the court found that $750,000 for past pain and suffering and $750,000 for future pain and suffering was adequate compensation.]; Barrowman v Niagara Mohawk Power Corp., 252 AD2d 946, 948 [4th Dept 1998] ["Lastly, we conclude that the award of $3,000,000 for plaintiff's past and future pain and suffering does not deviate materially from what would be reasonable compensation. As a result of the accident, plaintiff suffered herniated discs and a ruptured disc in his back that required two corrective surgical procedures: an anterior cervical discectomy and spinal fusion with the insertion of a bone graft strut; and a lumbar discectomy and bilateral posterolateral fusion with bone graft. Plaintiff testified regarding the severe stabbing pain he suffered during the four years before trial, including the crushing pain he experienced during a discogram diagnostic procedure. Medical evidence established that plaintiff's neck and back will continue to worsen over time and that additional fusion surgery will be required in both areas within the next five years; plaintiff will continue to experience pain in both areas for the rest of his life; and plaintiff is restricted to lifting no more than 20 pounds and will never be able to return to gainful employment" [internal citations and quotation marks omitted].; Hackworth v WDW Dev., Inc., 224 AD2d 265 [1st Dept 1996] ["We find that the jury's verdict awarding plaintiff an aggregate amount of $2,800,000 did not deviate materially from reasonable compensation, where the 27 year old plaintiff fell three stories and sustained injuries requiring a fusion of two discs, leaving him permanently disabled" [internal citations omitted].). This sum takes into account the testimony at trial that plaintiff could no longer work, would need life-long medical care, including a spinal stimulator, and that he was permanently disabled. Significantly, this Court, as it must, discounts the value of plaintiff's lumbar injuries because here, the lumbar injury preexisted the instant accident and was exacerbated thereby (Oakes v Patel, 20 NY3d 633, 647 [2013] ["But even where liability is established, the plaintiff may recover only those damages proximately caused by the malpractice. More specifically, where a condition existing before the malpractice occurred may have contributed to the plaintiff's injury, the plaintiff is not entitled to recover those damages that the preexisting condition would have caused in the absence of malpractice."]; McCahill v New York Transp. Co., 201 NY 221, 224 [1911] ["The principle is also true, although less familiar, that one who has negligently forwarded a diseased condition, and thereby hastened and prematurely caused death, cannot escape responsibility, even though the disease probably would have resulted in death at a later time without his agency. It is easily seen that the probability of later death from existing causes for which a defendant was not responsible would probably be an important element in fixing damages, but it is not a defense."]; Ortiz v Mendolia, 116 AD2d 707 [2d Dept 1986] ["We find no merit to appellants' claim that the first three interrogatories propounded to the jury and the court's charge precluded the jury from considering whether or not the subject accident of December 17, 1979 exacerbated and made symptomatic a pre-existing medical condition that had been asymptomatic. It is clear from the evidence, from the summation of appellants' own counsel (wherein he, in referring to the compensable injuries in this case, used the word "solely"), and from the charge, that a major issue was whether plaintiff Margarita Ortiz's disability flowed from the accident of December 17, 1979 or from a subsequent accident on November 10, 1980, in which she was involved."]).
With respect to plaintiff's cervical spine injury, namely two preexisting herniated discs for [*18]which surgery was recommened but not performed, and which grew in size as a result of this accident, the Court finds that $200,000 for past pain and suffering and $200,000 for future pain and suffering constitutes adequate compensation (Ellis v Emerson, 57 AD3d 1435, 1436 [4th Dept 2008] [Court concluded that "the awards of $125,000 for past pain and suffering and $275,000 for future pain and suffering do not deviate materially from what would be reasonable compensation," for a plaintiff who "sustained injuries to his cervical and lumbar spinal cord, including a herniated disc at C5—6 that was impinging upon the right side of the spinal cord. The herniated disc resulted in, inter alia, chronic neck pain, chronic headaches, weakness and numbness in plaintiff's right arm, decreased sensation in plaintiff's right hand, limited range of motion of plaintiff's neck and lumbar spine, and inability to sit for long periods" [internal quotation marks omitted].; Sow v Arias, 21 AD3d 317, 317 [1st Dept 2005] [Court held that $100,000 for past pain and suffering and $200,000 was adequate compensation for a plaintiff who " suffered two herniated cervical discs as a direct result of the trauma from the accident, with one disc impinging upon a nerve root."]). Again, this sum takes into account the testimony at trial that plaintiff could no longer work, needed surgery, which he refused, would need life-long medical care, and that he was permanently disabled. Significantly, and again, the Court, as it must, discounts the amount of the award because, here, the cervical injury preexisted the instant accident and was exacerbated thereby. 
With respect to the injury to plaintiff's right wrist and thumb, namely a TFCC tear and tendinitis, the Court finds that $300,000 for past pain and suffering and $300,000 for future pain and suffering constitutes adequate compensation (Nutley v New York City Tr. Auth., 79 AD3d 711, 711 [2d Dept 2010] ["Court held that $300,000 for past pain and suffering and $200,000 was adequate compensation when the plaintiff "suffered an injury to his dominant hand and wrist which required surgery. Despite the surgery, the plaintiff continued to experience pain, numbness, tingling, loss of strength, and loss of motion in his wrist and hand."]; Harris v City of New York, 2 AD3d 782, 784 [2d Dept 2003] [Court held that $200,000 for past pain and suffering and $350,000 for future pain and suffering was adequate when the plaintiff "injured the primary tendon in his wrist and thereafter underwent surgery to reconstruct and stabilize the tendon. His orthopedic surgeon described the surgery as successful, although the plaintiff continued to experience pain, weakness, numbness, and loss of motion in his wrist."]; Starr v Cambridge Green Homeowners Ass'n, Inc., 300 AD2d 779, 781 [3d Dept 2002] [Court held that $528,000 for past pain and suffering and $750,000 for future pain and suffering was adequate compensation when the plaintiff "sustained multiple fractures of the femur, which required surgery and the insertion of a surgical pin, a fractured calcaneus (heel bone), a fractured wrist on plaintiff's dominant hand, which required surgery and the insertion of five surgical pins, and a fractured hip."]). Here, the Court augments the award because plaintiff underwent three surgeries to his right wrist and thumb.
Lastly, with respect to the meniscus tear in the left knee the court finds $500,000 for past pain and suffering and $500,000 for future pain and suffering constitutes adequate compensation (Luna v New York City Tr. Auth., 116 AD3d 438 [1st Dept 2014] [Court held that award of $500,000 for past pain and suffering and $500,000 for future pain and suffering over a period of 34.5 years was adequate compensation where the plaintiff "suffered a torn meniscus in her right knee, underwent arthroscopic surgery, was unable to work for three months, used a cane for more than one month, underwent 12 extremely painful sessions of physical therapy, continues to [*19]experience significant pain requiring her to take medication and limit her activities, and has permanently aggravated and activated arthritis in her knee that is progressive."]; Smith v Manhattan and Bronx Surface Tr. Operating Auth., 58 AD3d 552, 552 [1st Dept 2009] [Court held that award of $100,000 for past pain and suffering and $800,000 for future pain and suffering was adequate compensation where the plaintiff "suffered severe damage to her left knee, including tears of the medial and lateral menisci, a torn ligament, torn cartilage in various places, and damage to the patella, with permanent osteochondral defect. She underwent arthroscopic surgery some months after the accident, and, while her knee improved to some degree, it never functioned normally again. Indeed, plaintiff continued to experience chronic pain, swelling and buckling of the knee, and her treating orthopedic surgeon, who testified at trial as her expert witness, recommended a second arthroscopic surgery. The surgeon testified that the injuries to plaintiff's knees were permanent and would continue to progress, and that arthritic changes would probably develop, requiring further surgical procedures, including perhaps knee replacement."]; Harris v City of New York Health & Hosps. Corp., 49 AD3d 321, 322 [1st Dept 2008 [Court held that award of $500,000 for past pain and suffering $250,000 for future pain and suffering constitutes adequate compensation where the plaintiff "suffered tears to the menisci of both knees and underwent arthroscopic surgery on her left knee, which had been operated on twice for a torn meniscus before the accident. Plaintiff was bedridden for about two weeks after the accident and two weeks after the surgery and received physical therapy for nine months. She walks with a cane, may require a knee replacement in 10 to 15 years, and is in constant pain. However, she is able to live independently, to do her own shopping and laundry and to travel by public transportation, and she is able to walk two blocks at a slow pace. She takes the same pain medication as she was taking before the accident."]).
For the foregoing reasons, Japan's motion is denied. 
To the extent that Japan avers that the jury's award was adequate because of plaintiff's the preexisting lumbar and cervical injuries, such contention is unavailing. 
While it is true that where a "jury could infer that much of the plaintiff's pain and suffering was attributable to [a] preexisting condition (Murphy v Ford, 173 AD3d 882, 883 [2d Dept 2019]; see Martinez v Coca-Cola Refreshments USA, Inc., 187 AD3d 1170, 1171 [2d Dept 2020]) the jury verdict, whatever it may have been, cannot be said to deviate from what would be reasonable compensation (Martinez at 1172; Murphy at 883), it is equally true that at trial, is entitled to credit or discredit the testimony of any expert produced by any party (Burgos at 559; Benloss at 423; Connolly at 413).
Here, contrary to Japan's assertion, the jury's verdict cannot be said to be adequate, as urged, merely because there was evidence that plaintiff's spine injuries preexisted the instant accident. In other words, this is not a case where the jury was merely asked to render a verdict upon evidence of preexisting injuries without a concomitant exacerbation charge. Instead, since, here, it was conceded that plaintiff had a prior spine injuries, the jury was fully aware that the lumbar injuries preexisted the instant accident, they were asked to consider whether the same were exacerbated by this accident, and based on the evidence, including testimony that prior spine injuries had healed before the instant accident, and expert testimony that said injuries were exacerbated by this accident, found exacerbation. To that end - per conflicting expert testimony - exacerbation was a highly contested issue. However, in finding exacerbation, it is clear that the [*20]jury chose to credit the testimony of plaintiff's experts and disregarded any controverting testimony by Japan's experts. Thus, as matter of law, here, Martinez and Murphy are inapposite and unavailing. Stated differently, here, the jury's verdict is not one where it is unclear whether they discounted the award because plaintiff had preexisting injuries and they were precluded from considering whether those injuries were exacerbated by the 2017 accident. Instead, in finding exacerbation, the jury found that the preexisting injuries were made worse by this accident and awarded damages accordingly. It is hereby
ORDERED that the jury verdict as to past pain and suffering and future pain and suffering damages is vacated as inadequate, and that a new trial, on those damages only, is immediately required unless the parties agree and stipulate to an award for past pain and suffering in the amount of $1.5 million and for future pain and suffering in the amount of $1.5 million. It is further
ORDERED that plaintiff serve a copy of this Order with Notice of Entry on Japan within thirty (30) days hereof.
This constitutes this Court's decision and Order.
Dated : February 4, 2025
Bronx, New York
FIDEL E. GOMEZ, JCC

Footnotes

Footnote 1:For formatting purposes, the third-party, second third-party, and third third-party actions are not reflected in the caption.

Footnote 2:As will be discussed at length Japan not only waived the right to make this motion insofar as premised on the error alleged, but it is clear the alleged error was not prejudicial. To that end, this motion treads awfully close to being frivolous.

Footnote 3:On January 23, 2024, plaintiff, on the record, discontinued his action against BMDC and prior thereto, Japan discontinued its cross-claim against BMDC.

Footnote 4:Notably, per the PJI Life Expectancy tables, the Court read PJI 2:281 to the jury and therein apprised the jury that plaintiff's life expectancy was 40.2 years.

Footnote 5:To the extent that Dr. Kaplan makes reference to a left hand injury in relation to the 2017 accident, this appears to be erroneous testimony or a transcription error. The evidence at trial evinced that as a result of the 2017 accident, plaintiff injured his right wrist and thumb.

Footnote 6:Notably although not forcefully urged by Japan, the experts who testified on its behalf controverted almost all of the opinions provided by plaintiff's experts. This, of course, is irrelevant, which is why Japan did not mention the same and the Court did not discuss the testimony of Japan's experts in any great detail. Again, in instances of dueling expert opinions, the can choose to credit any opinion or disregard the same(Burgos at 559; see Benloss at 423; Connolly at 413).